THE HONORABLE _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DOMAIN NAME COMMISSION LIMITED,<br><br>              Plaintiff,<br><br>   v.<br><br>DOMAINTOOLS, LLC,<br><br>              Defendant. | No. _____<br><br>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES |

In and for its Complaint for Injunctive Relief and Damages, plaintiff Domain Name Commission Limited ("DNCL") alleges as follows:

## I.    INTRODUCTION

1.    DNCL brings this action to stop Defendant DomainTools, LLC ("DomainTools"), from misusing .nz domain name registration information in violation of the Terms of Use for such information and applicable law, and from infringing the privacy of the individuals who register .nz domain names.

2.    DNCL is a non-profit organization, based in New Zealand, that has been appointed by InternetNZ to develop and monitor a competitive registrar market, as well as create a fair environment for the registration and management of .nz domain names.  In that capacity, DNCL is responsible for, among other things, authorizing and de-authorizing .nz domain name

COMPLAINT (NO. _____) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

registrars, administering the .nz Dispute Resolution Service, and—of particular import to this matter—enforcing .nz policies and regulating use of the .nz WHOIS service, which provides information about domain names ending in ".nz".  DNCL, in conjunction with InternetNZ, provides the service subject to specific Terms of Use ("TOU"), which are designed to (1) protect the privacy of the registrants who license .nz domains by preventing their registration information from being harvested in bulk; (2) provide individual registrants with control over their own registration information by prohibiting the retention and publication of historical WHOIS records, which may contain personal information that registrants later change or choose to withhold from the public; and (3) protect the integrity and accessibility of the .nz WHOIS servers.  Additionally, since November 2017, DNCL has offered individual registrants who do not conduct significant trade using their.nz domain names the opportunity to withhold their detailed contact information from the public through the .nz WHOIS service.  Thousands of individuals have taken this opportunity to protect their privacy.

3.      DomainTools's activities undermine the protections that DNCL promises to provide to .nz registrants and violate the TOU governing use of the .nz WHOIS service.  The products and services that DomainTools offers to its customers are built on practices that infringe .nz registrants' privacy rights and expectations by harvesting their registration information in bulk from the registry where it is maintained; using high-volume queries and technical measures designed to evade the restrictions that protect .nz WHOIS servers against that form of abuse; and storing and retaining registrant data, including detailed personal contact information, even after the registrant has chosen to withhold their data from the registry.  These activities cause irreparable harm to DNCL's reputation and integrity, divert resources from DNCL's mission, interfere with its contractual relationships with .nz domain name registrars, and harm the goodwill DNCL receives from individual registrants of .nz domain names.

COMPLAINT (NO. _____) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## II.    THE PARTIES

4.      DNCL is a non-profit entity that is registered in New Zealand as a charitable organization and a Limited Liability Company.  DNCL's sole shareholder is Internet New Zealand Incorporated ("InternetNZ"), a non-profit incorporated society established to protect, promote, and foster the development of the Internet in New Zealand.

5.      Upon information and belief, Defendant DomainTools is a Delaware limited liability company with its principal place of business located in Seattle, Washington.  Upon information and belief, Defendant DomainTools is a wholly owned subsidiary of Domain Tools Holdings, SARL, which is registered in Luxembourg and which is the sole member of DomainTools, LLC.

## III.    JURISDICTION AND VENUE

6.      This Court has jurisdiction of this action on the following bases:

a.      Under 28 U.S.C. § 1331, because this action alleges violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

b.      Under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, because the claims alleged under state law are so related to claims in this action over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.      This Court has personal jurisdiction over DomainTools because it resides and does business in this district, in that it maintains its principal place of business in Seattle, Washington.

8.      Venue is proper in this District under 28 U.S.C. § 1391 in that DomainTools maintains its principal place of business in Seattle, Washington, and as such resides in this district; a substantial part of the events or omissions giving rise to DNC's claims occurred in this district; and DomainTools is subject to personal jurisdiction in this district.

COMPLAINT (NO. _____) – 3

## IV.    FACTUAL BACKGROUND

### A.    Domain Name Background and Terminology

9.      An Internet user typically accesses a website by opening a web browser, clicking on the navigation bar, and entering a Uniform Resource Locator ("URL").  For example, the URL for DNCL's website is "http://www.dnc.org.nz".  As the user browses on DNCL's website, he or she will be directed to various other URLs, such as "http://www.dnc.org.nz/irpo" or "http://www.dnc.org.nz/story/policy".

10.      A domain name is a string of characters that is used to locate a web site on the Internet.  Domain names were developed because they are easier for Internet users to remember than the numerical IP addresses the Internet actually uses to route traffic.  When an Internet user enters a domain name into a browser, for example, the browser consults the Domain Name System ("DNS"), which looks up the numerical IP address that corresponds to the domain name. Underlying network protocols then use the IP address to locate and identify computer services and devices operated by individuals or organizations on the Internet.  Domain names are most commonly used in URLs or email addresses.  For example, "dnc.org.nz" is the domain name in the URL for DNCL's website on the Internet described in Paragraph 9 above, and in associated email addresses, such as info@dnc.org.nz.

11.      Domain names are split into multiple pieces.  Each piece is separated by a period and is part of a hierarchical structure of domain name identifiers.

12.      A top-level domain ("TLD") is at the highest level in the DNS hierarchy, and is represented by the portion of the domain name to the right of the last period (i.e., ".nz" in the domain name "dnc.org.nz").

13.      A country code TLD ("ccTLD") is a specific kind of TLD that is specifically designated for a particular country, sovereign state, or other territory to use to service its community.  ccTLDs are assigned using the two-level country codes defined by the International Organization for Standardization to represent countries, dependent territories, and special areas

COMPLAINT (NO. _____) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

of geographical interest.  In particular, the country code in a ccTLD indicates the country that administers and sets policies regarding domain name registration for that ccTLD.  ccTLDs are held in trust for the local Internet community of the country they represent by a designated manager appointed by that community.  The ccTLD for New Zealand is ".nz" and its designated manager is InternetNZ.

14.     The "second-level domain" is the piece of the domain name at the second highest level in the DNS hierarchy (i.e., ".org" in the domain name "dnc.org.nz").  Similar to ccTLDs for many countries other than the United States and Canada, second-level domains for .nz frequently indicate the core purpose of a website.  For example, a ".org.nz" website serves an organizational purpose; a ".gov.nz" website serves a governmental purpose; and a ".co.nz" website serves a commercial purpose.

15.     The domain "identifier" is chosen by the individual or organization who can be located through the domain name (i.e., "dnc" in the domain name "dnc.org.nz").

16.     The Internet Corporation for Assigned Names and Numbers ("ICANN") is a non-profit organization responsible for coordinating and maintaining the Internet's unique identifiers, including domain names, TLDs, and ccTLDs.

17.     A registrant is an individual, company, or organization that registers and manages a domain name on the Internet.  Domain names are licensed to registrants.

18.     A domain registry is the organization that manages TLDs and their infrastructure.  A domain registry's responsibilities typically include creating domain name extensions, developing the policy framework for the domain, and keeping the definitive register of domain names.

19.     A registrar is an organization, accredited by ICANN, that acts as a middle-man between a registry and registrants, in that it has the authority to issue domain licenses from registries to registrants.  Registrars manage domain names on behalf of registrants.

COMPLAINT (NO. _____) – 5

20.     Registrars and registries are required by their contracts with ICANN to operate a service called WHOIS, which allows the public to search for and obtain information about registered domains.  The data returned by the WHOIS service typically includes (1) information about the domain (e.g., the date it was registered or last modified, its status, and its expiration); (2) information about the registrar (e.g., its name and contact information); and (3) information about the registrant (e.g., the name and contact information of the organization or individual currently managing the domain name).

**B.      Operation and Organization of the .nz Domain Name Space**

21.     InternetNZ was established in 1995 for the purpose of managing the .nz ccTLD and was appointed to be the designated manager for the .nz ccTLD by the local Internet community of New Zealand in 1996.  As designated manager for the .nz domain, InternetNZ has a duty to manage the .nz ccTLD in service to the local internet community.  Among other responsibilities, InternetNZ operates the registry for .nz, meaning it keeps the definitive register of .nz domain names and is responsible for the policy framework relating to the .nz domain name space.

22.     ICANN has formally recognized InternetNZ as the sole authority for the administration and management of .nz domain names.  There are currently over 700,000 registered .nz domain names, a tiny fraction of the well over 330 million domain names across the world and all TLDs.

23.     InternetNZ established DNCL as its wholly-owned subsidiary in 2007.  DNCL's organizational mission is to develop, monitor, and oversee a competitive registrar market and to create a fair environment for the registration and management of .nz domain names.  InternetNZ appointed DNCL to manage and administer the .nz domain name space under the terms of an Operating Agreement between the entities dated April 1, 2008.

24.     Under these agreements, DNCL performs several functions, including overseeing the registration and management of .nz domain names, authorizing registrars, managing the

COMPLAINT (NO. _____) – 6

operation of the .nz domain name space and the agreements and policies that underpin it, monitoring activity in and regulating the use of the .nz domain name space, administering a dispute resolution service for disputes between .nz domain name registrants, and representing the .nz domain name space in international fora.  In sum, DNCL has sole authority for administration and management of .nz domain names on behalf of the people and businesses of New Zealand and other .nz registrants.

25.     InternetNZ issues policies which govern the operation and regulation of the .nz domain name space, and DNCL is responsible for enforcing these policies.  The Operations and Procedures policy sets out the operations and procedures that apply to the running of the .nz domain name space.  They must be followed by all participants in the .nz domain name space.  A copy of the Operations and Procedures policy is attached as **Exhibit 1** to this Complaint.

26.     To request a .nz domain name, an individual or organization must provide certain information to a registrar, including the potential registrant's name, contact details (email address, physical address, and contact phone number), administrative and technical contacts, and other information.  The registrar is responsible for ensuring the domain name is available, that mandatory information has been provided, and that the information provided is in the correct format where appropriate (e.g., domain name or email address).  The registrar then accesses the .nz register to enroll and maintain the domain name on behalf of the registrant.

27.     After the registration is added to the .nz register, domain name registration information becomes available through the WHOIS service.  As a result, that information is frequently referred to as "WHOIS data" or "WHOIS information."

C.      **Terms of Use Governing the .nz WHOIS Service**

28.     WHOIS information for the .nz domain name space can be accessed via three avenues: (1) the DNCL website; (2) the .nz Port 43 service; and (3) registrars who have special access to the .nz WHOIS service via SRS xml or EPP xml lookups (these are authenticated requests made against registry systems which only authorized .nz registrars can use).  Although

COMPLAINT (NO. _____) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

.nz WHOIS information is available through other sources, for example, through registrars or third-parties like DomainTools, those sources must ultimately use one of these three avenues.

29.     DNCL has made a deliberate policy decision to allow the public to obtain WHOIS data for .nz domain names only by searching a specific domain name, with exceptions only in limited circumstances when DNCL approves applications to obtain registrant information to support disputes over .nz domain name disputes or to obtain information about the inquirer's own .nz domain registrations.  DNCL offers no automatic function whereby the public may search for a registrant's name, phone number, email address, or physical address to obtain .nz WHOIS information.

30.     The vast majority of WHOIS queries are sent through Port 43.  In a typical month, over 10 million .nz WHOIS queries are performed, of which less than 1% are conducted using the DNCL website.

31.     WHOIS data is commonly used to determine the availability of domain names.  Because WHOIS data includes information regarding the registrant of a domain name, it may also be used to help combat spam or fraud, identify trademark infringers, and enhance accountability of domain name registrants.  In addition, WHOIS data can be used to identify and locate domain name registrants who may be posting illegal content or engaging in phishing scams.

32.     To prevent abuse of the .nz WHOIS service, DNCL provides WHOIS data in response to a WHOIS query pursuant to the terms and conditions of the TOU.  Specifically, the TOU provide:

> **Terms of Use**: By submitting a WHOIS query you are entering into an agreement with Domain Name Commission Ltd on the following terms and conditions, and subject to all relevant .nz Policies and procedures as found at https://dnc.org.nz/. It is prohibited to:
>
> - Send high volume WHOIS queries with the effect of downloading part of or all of the .nz Register or collecting register data or records;

COMPLAINT (NO. _____) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

- Access the .nz Register in bulk through the WHOIS service (ie. where a user is able to access WHOIS data other than by sending individual queries to the database);

- Use WHOIS data to allow, enable, or otherwise support mass unsolicited commercial advertising, or mass solicitations to registrants or to undertake market research via direct mail, electronic mail, SMS, telephone or any other medium; . . .

- Use WHOIS data in contravention of any applicable data and privacy laws, including the Unsolicited Electronic Messages Act 2007;

- Store or compile WHOIS data to build up a secondary register of information;

- Publish historical or non-current versions of WHOIS data; and

- Publish any WHOIS data in bulk.

33.     The TOU were last updated on June 26, 2016.  Before that period, the TOU provided:

Users are advised that the following activities are strictly forbidden.

Using multiple WHOIS queries, or using the output of multiple WHOIS queries in conjunction with any other facility or service, to enable or effect a download of part or all of the .nz Register.

Using any information contained in the WHOIS query output to attempt a targeted contact campaign with any person, or any organisation, using any medium.

A breach of these conditions will be treated as a breach of the .nz Policies and Procedures. Sanctions in line with those specified in the policies and procedures at www.dnc.org.nz may result from any breach.

34.     When a user searches for a domain on the DNCL website, the TOU are shown at the bottom of the results page.  An exemplar screenshot of how the DNCL website displays the WHOIS results page, including the TOU, is attached to this Complaint as **Exhibit 2**.

35.     When a user searches for a domain through the Port 43 WHOIS service, the TOU are displayed above the WHOIS data.  An exemplar screenshot showing how the TOU are

COMPLAINT (NO. _____) – 9

displayed in response to a WHOIS query through Port 43 is attached to this Complaint as **Exhibit 3**.

36.     Use of the .nz WHOIS service, whether through the DNCL website or through Port 43, indicates agreement to these TOU.  The TOU are displayed every time a query is submitted, meaning that ongoing and continuous use of the .nz WHOIS service establishes actual knowledge of and agreement to the TOU.

37.     The DNCL website includes a page, available at https://www.dnc.org.nz/whois, explaining that .nz domain name registration information can be searched by domain name (a screenshot of this page is attached as **Exhibit 4** to this Complaint).  That page further explains that "[t]he ability to search for" .nz domain name registration "information is referred to as a domain name registration query ('Query') or a domain name search," and that "[b]y performing a 'Query,' you are also agreeing to be bound by the Terms of Use of the service."

38.     In addition to but independent of the TOU, DNCL has implemented extensive automated rate limiting to prevent bulk harvesting of .nz WHOIS data.  The rate limiting operates both for individual IP addresses and for aggregate blocks of IP addresses using multiple methods of aggregation.  On the basis of this rate limiting, the .nz WHOIS servers typically have blocked between 40 million to 80 million WHOIS queries per month.

39.     Nonetheless, rate limiting based on IP addresses can be evaded by using cloud services to run multiple simultaneous queries from a wide range of IP addresses.

40.     Due to these increasing concerns about bulk harvesting of .nz WHOIS registrant data, since April 20, 2018, information that identifies .nz domain name registrants or administrative or technical contacts is no longer being offered through Port 43.

**D.     Registrant Privacy and the.nz Individual Registrant Privacy Option**

41.     Registrants around the world have become increasingly concerned about their personal information, especially their personal contact information, being publicly available through WHOIS.  As a result, ICANN, registries, and registrars have begun taking steps to

COMPLAINT (NO. _____) – 10

provide registrants with enhanced choice and control over the public disclosure of their personal information.

42.     More recently, in relation to the European Union's General Data Protection Regulation, in a letter dated December 6, 2017, the Article 29 Data Protection Working Party expressed its view that "public access to the Whois data in its current form goes beyond" the legitimate purpose for WHOIS services.  ICANN responded in March 2018 by issuing a "cookbook" describing an interim model intended to comply with EU privacy law.

43.     In New Zealand, InternetNZ and DNCL have long been attuned to registrant privacy and safety concerns and the tension between the need to provide choice and control over their personal information to individual registrants and the benefits of public availability of WHOIS data.

44.     For example, it is important that .nz domain name registrants be identifiable to ensure accountability and that they can be quickly contacted in cases of harm.  Bad actors can and do use domain names to attack, harass, or scam other people.  There is a benefit in the public being able to see who is behind a domain name to verify the trustworthiness of.nz websites or email addresses, or to increase consumer confidence when online trade is involved.  In addition, WHOIS provides a valid and valuable tool for those who have protection and legal rights to enforce.  And if a website is hacked, the WHOIS information can be used to inform the owner that their interests are being compromised.  There is benefit in being able to identify domain name contact details promptly, particularly where harm is occurring.

45.     At the same time, there is increasing awareness of the sanctity of privacy in the online world.  Surveys conducted for the New Zealand Office of Privacy Commissioner have highlighted that many individuals in New Zealand are concerned about the privacy of their online information.  In particular, many people are concerned about the privacy implications of having their contact details publicly visible.

COMPLAINT (NO. _____) – 11

46.     Around October and November 2015, DNCL conducted its first public consultation about why registrant personal data should or should not be collected and made accessible through a WHOIS search.  Specifically, DNCL sought and obtained input from the New Zealand Internet community about why .nz registrant data should or should not be collected; why that data should or should not be made publicly available; why the display and availability of .nz registrant data should or should not be the same for all parties; and whether there were any concerns about the current approach.

47.     DNCL conducted its second public consultation around January 2016.  For the second consultation, DNCL asked for and obtained input from the New Zealand Internet community about whether the full range of .nz WHOIS data—which included registrant contact name and contact details, admin contact name and contact details, technical contact name and contact details, domain name details, name servers, and registrar information—should continue to be provided in response to a WHOIS search.  In addition to receiving written submissions, DNCL held public meetings online and in person in Christchurch, Auckland, and Wellington.

48.     In June 2016, DNCL held a third public consultation requesting input on a proposed change that would allow individual registrants to have their details withheld from publication under certain circumstances, such as where their personal safety may be at risk if their contact details were displayed.  This proposal was based on the mix of submissions received during the two earlier consultations:  the submissions largely supported making registrant details publicly available in response to WHOIS searches, but also raised some concerns about registrant privacy and security.  DNCL received written submissions ranging from those saying no information should be made public, to supporting the proposed privacy process, to supporting the status quo, and many options in between.

49.     DNCL held a fourth public consultation in October and November 2016, which sought and obtained input on a new proposal, in which a registrant who declared he or she was an individual would automatically have his or her contact address and telephone number

COMPLAINT (NO. _____) – 12

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

information withheld from public WHOIS data.  The consultation also sought input on whether to include geography with name and email information in the publicly available WHOIS data.

50.     The fifth and final consultation was held between March and May 2017, which sought and obtained input on proposed changes that would (1) provide individual registrants who do not use the domain name to a significant extent in trade with the *option* of withholding their telephone number and address information from public WHOIS data, and (2) define a process for requesting the withheld information if a legitimate need is established.

51.     Based on this extensive consideration and solicitation of input from the New Zealand Internet community, on November 28, 2017, DNCL launched the Individual Registrant Privacy Option ("IRPO").  Since March 28, 2018, all authorized .nz registrars have been required to offer registrants the ability to apply for the IRPO.

52.     The IRPO is available to individual registrants of .nz domain names who do not use their licensed domain name for significant trade.  A registrant may apply for the IRPO through his or her authorized .nz registrar at the time of registering the domain name or at any later time.  If a registrant is eligible, his or her telephone number and address ("Withheld Data") will be withheld from the public WHOIS record and not displayed.  The public WHOIS record will still include his or her other contact information, including name, email, and country.  In addition, the registrant is still responsible for providing true and correct registration details, including email, phone, and address contact information.

53.     Even if an individual registrant has opted into the IRPO, that individual's Withheld Information may nonetheless be disclosed if an entity can establish a legitimate need for access, both on a one-off and an on-going basis.  For entities that have a legitimate need for ongoing access to Withheld Information, DNCL will enter Memorandums of Understanding with those entities that will facilitate either streamlined or automatic access to the Withheld Information or historical records.  To ensure it provides appropriate transparency into access and

COMPLAINT (NO. _____) – 13

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

disclosure of individuals' Withheld Information, DNCL will post the MOUs on its website, notify the registrant of the access as soon as practicable, and publish transparency reports.

54.     DNCL entered into its first such MOU on June 8, 2018, with the Computer Emergency Response Team (CERT) (which forms part of the Ministry of Business, Innovation and Employment).

55.     Accordingly, the IRPO uses a carefully balanced process through which registrants can protect their private information while public authorities can still obtain that information for legitimate reasons.

56.     DNCL implemented the IRPO to allow registrants to control and protect their private information in recognition of the significant privacy and safety concerns of many .nz domain name holders.

57.     Since November 28, 2017 over 11,000 domain names have successfully enrolled in the IRPO, establishing the importance of privacy options to .nz domain registrants.  For context, this comprises approximately 1.5% of *all* domain name registrations (in total there are approximately 710,000 active.nz domain names), including organizations and individuals who conduct significant trade using their domain names and therefore are ineligible for the IRPO.

58.     By combining availability of the IRPO with strict enforcement of the TOU, DNCL empowers many individual .nz registrants to withhold their personal contact information altogether.  This is because the information is neither presently available nor re-creatable through historical records held by third parties.

## V.     DOMAINTOOLS'S ACTIVITIES

### A.     DomainTools's Products and Services

59.     DomainTools offers a variety of products and services that it markets to security analysts and government agencies as a tool to fight security risks.  DomainTools touts its products and services on its website:

COMPLAINT (NO. _____) – 14



DomainTools, About Us, https://www.domaintools.com/company/ (last visited June 14, 2018).

60. Upon information and belief, DomainTools's products and services rely extensively on WHOIS data, including vast quantities of non-current, historical WHOIS records. For example, DomainTools's website states that "Our solutions are comprised of over 15 years of data, which include Whois records, passive DNS data, related screenshots, IP addresses, hosting data, name servers, and other DNS data."

COMPLAINT (NO. _____) – 15

## If the Threat Includes a Domain Name, DomainTools Has the Intel.

We live by the mantra that with better data, we can provide better answers. Our solutions are comprised of over 15 years of data, which include Whois records, passive DNS data, related screenshots, IP addresses, hosting data, name servers, and other DNS data. DomainTools' data and products work in harmony to enable security teams to start getting ahead of attacks, gain context and visibility into potential threats, and lower the skills barrier.

DomainTools, Products Overview, https://www.domaintools.com/products/ (last visited June 14, 2018).

61.     DomainTools markets its services using the size and claimed coverage of its database of WHOIS records.  A video on DomainTools's website states that DomainTools maintains "the world's largest database of WHOIS, DNS, and related data."  And DomainTools's blog states that:

> DomainTools works tirelessly to build the world's best database of Whois records, with coverage spanning all of the ccTLDs and each new gTLD as it comes online—not to mention the "big six" TLDs: com, net, org, biz, info, and us. We believe we have reason to claim that our coverage is unparalleled.

DomainTools Blog, *What's Better than the World's Best Whois Data? The World's Best PARSED Whois Data!*, https://blog.domaintools.com/2014/08/whats-better-than-the-worlds-best-whois-data-the-worlds-best-parsed-whois-data/ (last visited June 14, 2018).

62.     Several of DomainTools services rely on both current and historic WHOIS data, including .nz WHOIS data.

63.     For example, DomainTools offers to the public its own, free "Whois Lookup" tool at https://whois.domaintools.com.  The Whois Lookup results page available to the public includes a complete copy of the Whois Record, as it appears at the time of the lookup.

COMPLAINT (NO. _____) – 16

64.     Upon information and belief, when a query for a .nz domain name is entered on the DomainTools Whois Lookup tool, DomainTools automatically obtains the WHOIS record from the Port 43 WHOIS service, posts that information in its results page, and saves that WHOIS record in its database as a historical WHOIS record.  Notably, although DomainTools does not appear to make any other changes to the WHOIS record obtained from DNCL, it strips the TOU out of the WHOIS record before displaying it in response to a search for a .nz domain. An exemplar screenshot of this results page is attached to this Complaint as **Exhibit 5**.

65.     Upon information and belief, DomainTools uses a distributed network of IP addresses from all over the world to query the .nz WHOIS service on Port 43.  Upon information and belief, DomainTools uses this distributed network of global IP addresses to conceal its violation of the TOU, evade the .nz WHOIS rate limiting protocols, and enable DomainTools to execute a high volume of queries without being blocked, with the purpose of obtaining WHOIS records for most if not all domain names in the .nz Registry.

66.     According to DomainTools advertising, it provides its paying customers with additional information on the results page for a domain name search on the DomainTools Whois Lookup tool.  For example, DomainTools provides information about how many other domains are associated with the same domain registrant and how many historical WHOIS records DomainTools maintains for that domain name.  DomainTools calls these services "Reverse Whois" and "Whois History," respectively.

67.     DomainTools's "Reverse Whois" tool allows the user to search for a "unique identifier" such as an individual's name or a company's name, phone number, email address, or physical address and obtain a list of all domain names linked to that person or organization.  This tool allows the user to obtain extensive WHOIS information based on an individual's identity, rather than based on an individual domain.  Upon information and belief, DomainTools provides this service by maintaining and querying a database similar to a domain registry that associates registrants with the registration information for the domain names they license.

COMPLAINT (NO. _____) – 17

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

68.     DomainTools's "Whois History" tool "allows DomainTools members to access historical Whois records.  Since 1995, DomainTools has been tracking the Whois history of millions of domains.  These records are maintained in the DomainTools database and available to Subscription Members."  DomainTools, Whois History, http://research.domaintools.com/research/whois-history/ (last visited June 14, 2018).

69.     When a customer searches for a domain through the Whois History tool, DomainTools provides a display allowing the customer to access all historical WHOIS records that DomainTools has obtained and stored for that domain.  The Whois History page even highlights the dates on which something changed in the Whois record.  In addition, the Whois History page allows customers to filter historical Whois records using, for example, "a whole or partial registrant name, organization name, physical address, [or] phone number."  DomainTools, Whois History User Guide, https://www.domaintools.com/ resources/user-guides/whois-history/ (last visited June 14, 2018).

70.     DomainTools advertises that its Whois History page displays "[a] symbol . . . next to the date to indicate records where Whois privacy was used," which allows the user "to quickly scan the timeline to find a time when a domain was not protected under Whois privacy controls." DomainTools, Whois History User Guide, https://www.domaintools.com/resources/user-guides/whois-history/ (last visited June 14, 2018).  The video associated with Whois History states that "sometimes it's very important to spot records where there is no Whois privacy in place.  This can be one of the most important ways to discover who is or was behind a domain."

71.     In addition, members of the public can purchase a "Domain Report," which allows customers to simultaneously access all information that DomainTools maintains about a particular domain—including both the current and all historical WHOIS records.  Specifically, DomainTools advertises:

COMPLAINT (NO. _____) – 18



**How does this work?**

Enter a domain name and we'll tell you **exactly how much** current and historical data you'll get. Reports include all this data:

▸ Every **Historic Whois** record we have

▸ Our complete **website screenshot** history

▸ Owner (registrant) name and email address

▸ Current Whois record

▸ Registration dates and status codes

▸ Network name and IP location

▸ Reverse IP & Name Server connected domains

▸ and more!

If you decide to buy a report, our system will gather the data **into a single** PDF **document** that you can download within minutes of your purchase.

DomainTools, DomainReport, http://domainreport.domaintools.com/ (last visited June 14, 2018).

**B.**     **DomainTools's Activities Violate the .nz WHOIS Terms of Use and Other Laws, and Undermine the Privacy of Individual Registrants**

72.     DomainTools has violated the TOU, circumventing technical controls, querying the .nz registry in bulk, retaining historical WHOIS records, and creating a secondary registry so that it can sell registrants' private information to DomainTools's paying customers.

73.     Specifically, upon information and belief, DomainTools conducts a high volume of queries through the .nz WHOIS Port 43 service to populate its database of current and historical WHOIS records.  In doing so, DomainTools has violated and continues to violate the provisions of the Terms of Use that prohibit "[s]end[ing] high volume WHOIS queries with the effect of downloading part or all of the .nz Register or collecting register data or records" and "[a]ccess[ing] the .nz Register in bulk through the WHOIS service (i.e., where a user is able to access WHOIS data other than by sending individual queries to the database)."

74.     In addition, DomainTools's activities violated the previous version of the Terms of Use, which prohibited "[u]sing multiple WHOIS queries, or using the output of multiple WHOIS queries in conjunction with any other facility or service, to enable or effect a download

COMPLAINT (NO. _____) – 19

of part or all of the .nz Register." In particular, DomainTools's website indicates that it has WHOIS records for approximately 665,280 .nz domains, which comprises approximately 94% of the total number of .nz domain names (just under 710,000).

75. Upon information and belief, DomainTools maintains a database of WHOIS records, including .nz WHOIS records obtained through the .nz WHOIS Port 43 Service, that associates .nz domain names with registration information. DomainTools then relies upon this database to allow users to search for WHOIS information using a registrant's name or contact information, including information that the registrant may have chosen to withhold, not only the domain name as is typical for WHOIS services. In doing so, DomainTools has violated and continues to violate the provision of the Terms of Use that prohibits "[s]tor[ing] or compil[ing] WHOIS data to build up a secondary register of information."

76. DomainTools makes available to the public for a fee all historical WHOIS records that it has obtained for a domain, including .nz domains. In doing so, DomainTools has violated and continues to violate the provision of the Terms of Use that prohibits "[p]ublish[ing] historical or non-current versions of WHOIS data."

77. DomainTools sells to its customers access to substantially all of the .nz WHOIS records that it has accumulated and allowing them to search those records in bulk through its Reverse Whois and Whois History services. In doing so, DomainTools has violated and continues to violate the provision of the Terms of Use that prohibits "publish[ing] any WHOIS data in bulk."

78. Registrars in the United States have expressed similar concerns with the methods that DomainTools has used and continues to use to access WHOIS data, and the amount of WHOIS data that DomainTools makes available to the public.

COMPLAINT (NO. _____) – 20

**C.      DomainTools's Unlawful Activity Harms DNCL**

79.      DomainTools's unlawful activities as described in Paragraphs 59-77 above have already caused and continue to cause irreparable harm to DNCL and to individual .nz domain name registrants.

80.      DomainTools's activities have damaged and continue to damage DNCL's integrity and reputation in the New Zealand Internet community due to loss of goodwill from individual registrants who license .nz domain names.  Specifically, DNCL represents and assures individual .nz domain names that if they successfully apply for the Individual Registrant Privacy Option, their detailed contact information will be withheld from public view and made available only pursuant to a rigorous process to entities that can establish a legitimate need for that information.  DomainTools has never sought to enter into a Memorandum of Understanding with DNCL establishing a legitimate need for the information that individual registrants have chosen to withhold from public view.  Yet DomainTools's activities make individual registrants' withheld personal data available to the public for a fee by providing historical WHOIS records, which may include those registrants' detailed personal contact information, even after an individual registrant has exercised his or her option to withhold that information from the public.

81.      In addition, individual registrants of .nz domain names have expectations of privacy based on New Zealand law providing certain statutory privacy rights to individuals.  DNCL's Terms of Use for the .nz WHOIS service protect individuals' privacy rights.  DomainTools's violations of DNCL's Terms of Use frustrate these individuals' privacy rights and cause further harm to registrant good will and to DNCL's reputation and integrity.

82.      By interfering with the Individual Registrant Privacy Option, DomainTools's activities also interfere with DNCL's mission and contractual obligations, and have diverted and continue to divert DNCL resources away from its core organizational mission.

83.      DomainTools's unlawful activities are also preventing DNCL from providing its services in accordance with the TOU and IRPO implemented in response to privacy and safety

COMPLAINT (NO. _____) – 21

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

concerns raised by the .nz Internet community.  DNCL therefore is being thwarted in its ability to offer its services in accordance with the TOU, to implement policies supported by the people and businesses of New Zealand and other .nz registrants, and to honor individual registrants' choice to protect the privacy of their personal information.

84.     By issuing high-volume queries to the .nz WHOIS service, DomainTools is also taxing the .nz WHOIS servers, disrupting network transmissions, and otherwise interfering with technical infrastructure.

85.     The harms caused by DomainTools's unlawful activities are not mitigated or balanced by any value provided through DomainTools's services.  The customers who would seek to use DomainTools services to obtain information about .nz domains could, in the alternative, obtain current .nz WHOIS information that is freely available through DNCL's website, save for personal information that individual registrants have chosen to withhold pursuant to the IRPO.  In addition, when appropriate, historical and withheld .nz WHOIS information is available through special request (either for one-time or for ongoing access) at https://dnc.org.nz/irpo/access.

86.     In addition, the information regarding .nz registrants available through DNCL is more current and accurate than that available through DomainTools, which continues to publish historical (and therefore potentially outdated) information.  DomainTools's customers, including law enforcement and other public interest organizations, would receive more accurate .nz WHOIS information (for free and without violating the TOU) through DNCL.

**D.     DNCL's Efforts to Stop DomainTools's Unlawful Activity**

87.     DNCL has sought to get DomainTools to cease and desist its unlawful activities and to stop harming DNCL and .nz registrants without the need for litigation.

88.     On November 2, 2017, counsel for DNCL sent a cease and desist letter to DomainTools explaining that DNCL had become aware that DomainTools was accessing and querying .nz WHOIS servers, downloading .nz WHOIS data, storing a vast database of historical

COMPLAINT (NO. _____) – 22

WHOIS records, and re-publishing that data through its "Whois History" and "Reverse Whois" products, and that DomainTools's activities were violating the Terms of Use and other laws. The letter demanded that DNCL immediately desist accessing .nz WHOIS servers or using and publishing .nz WHOIS data except as permitted by the Terms of Use.  A copy of this letter is attached to this Complaint as **Exhibit 6**.

89.     Although the cease and desist letter demanded a response by November 15, 2017, DNCL extended the response period at the request of counsel for DomainTools in hopes of obtaining DomainTools compliance without litigation.  Accordingly, it was not until February 7, 2018, that DomainTools responded to DNCL's cease and desist letter.  A copy of DomainTools's response is attached to this Complaint as **Exhibit 7**.

90.     The parties then engaged in settlement discussions, including an in-person meeting in Seattle, Washington, on March 20, 2018.  On April 22, 2018, those settlement discussions concluded without any agreement by DomainTools that it would cease its violation of the TOU and other applicable laws or its abuse of the WHOIS service offered by DNCL.

91.     DNCL sent a final cease and desist letter to DomainTools on June 6, 2018, finally and, pursuant to its right to "remove or limit any party's access to the Query service on a permanent or temporary basis," *see* **Exhibit 3** at Section 21.4.1, completely revoked DomainTools's license to use the .nz WHOIS service due to its ongoing breach of the terms governing use of that service.  A copy of this letter is attached to this Complaint as **Exhibit 8**. DomainTools has continued to send queries to the .nz WHOIS service.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

92.     DNCL realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-91 above.

COMPLAINT (NO. _____ ) – 23

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

93.     A claim for breach of contract requires showing (1) the defendant entered into a contract, (2) the terms of the contract, (3) that the defendant breached the duties imposed by the contract, and (4) the plaintiff was damaged.

94.     By using the .nz WHOIS service, DomainTools entered into a contract with DNCL requiring DomainTools to abide by the TOU in exchange for DNCL providing the WHOIS data.

95.     DomainTools had actual notice of the TOU because it made repeated, ongoing, and continuous requests to the .nz WHOIS service through Port 43.  Each of these requests received a response containing the TOU above the WHOIS data.

96.     Since 26 June 2016, the TOU have provided that it is prohibited to, among other things, (1) send high volume WHOIS queries with the effect of downloading part of or all of the .nz Register or collecting register data or records; (2) access the .nz Register in bulk through the WHOIS service (ie. where a user is able to access WHOIS data other than by sending individual queries to the database); (3) store or compile WHOIS data to build up a secondary register of information; (4) publish historical or non-current versions of WHOIS data; and (5) publish any WHOIS data in bulk.  The previous TOU provided that it is prohibited to, among other things, use multiple WHOIS queries, or use the output of multiple WHOIS queries in conjunction with any other facility or service, to enable or effect a download of part or all of the .nz Register.

97.     DomainTools has breached and continues to breach these provisions of the TOU by engaging in the conduct alleged in Paragraphs 59-77 above and other activities.

98.     DNCL has been damaged by DomainTools's activities as described in Paragraphs 59-77 above, in that DNCL has experienced loss of goodwill from individual registrants, harm to its reputation and integrity in the .nz Internet community, and interference with its mission and other contractual relationships.

COMPLAINT (NO. _____) – 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

**SECOND CAUSE OF ACTION**
**(Violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C))**

99.     DNCL realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-98 above.

100.     A claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C), requires showing that the defendant intentionally accessed a protected computer without authorization, and as a result of such conduct, caused damage and loss; and that the plaintiff suffered damage or loss from the violation aggregating to at least $5,000 in value over a one-year period.

101.     DomainTools was authorized to access the .nz WHOIS servers and the WHOIS service only if it complied with the TOU.  DomainTools was expressly not authorized to access the .nz WHOIS servers and the WHOIS service in violation of the TOU.  Indeed, DomainTools even employed technical measures to evade IP blocking and IP rate limiting.

102.     In addition, because of its continuous and ongoing violation of the TOU, DNCL revoked altogether DomainTools's limited license to access and use the .nz WHOIS on June 6, 2018.

103.     DomainTools has continued to access the .nz WHOIS servers without authorization and thereby obtain .nz WHOIS data from those servers.

104.     The computers and servers that provide the .nz WHOIS servers are used in interstate and foreign commerce and communication, and DomainTools's conduct involved interstate commerce and communication.

105.     As a result of DomainTools's actions, DNCL has suffered loss in an amount far in excess of the $5,000 statutory minimum, during each relevant one-year period, in an amount to be proved at trial.

COMPLAINT (NO. _____) – 25

### THIRD CAUSE OF ACTION
**(Violations of Washington Consumer Protection Act, RCW 19.86.020 *et seq.*)**

106.    DNCL realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1-105 above.

107.    A claim under the Washington Consumer Protection Act requires showing (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) with a public interest impact; (4) causing; (5) injury to plaintiff in its business or property.

108.    DomainTools's activities as alleged above were willful and malicious, and constitute unfair or deceptive acts or practices in violation of RCW 19.86.020 *et seq.*

109.    DomainTools has engaged in these unfair acts or practices for purposes of selling private registrant information obtained in violation of the TOU in the form of its products and services in trade or commerce.

110.    The public is integrally involved in this private dispute because it involves DomainTools's unfair acts and practices depriving consumers, including residents of Washington state, of the opportunity to choose and control the use and disclosure of their personal, private information.

111.    DomainTools's unfair acts and practices have caused DNCL to suffer injury in its business and property, including harm to its reputation and integrity and loss of goodwill from individual .nz domain name registrants, in an amount to be proved at trial.

112.    Accordingly, pursuant to RCW 19.86.090, DNCL is entitled to injunctive relief, actual and trebled damages, attorney's fees, and costs of suit.

COMPLAINT (NO. _____) – 26

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

## VII.    PRAYER FOR RELIEF

WHEREFORE, DNCL prays for the following relief:

A.    Declaratory relief as to each of the above causes of action;

B.    Preliminary and permanent injunctive relief, including that DomainTools and its agents, services, employees and all persons in active concert or participation with it, be enjoined and restrained during the pendency of this action and perpetually from:

    (1)    Accessing the .nz Register so long as its limited license remains revoked; or, in the alternative, sending automated, high-volume WHOIS queries and accessing the .nz Register in bulk;

    (2)    Storing or compiling .nz WHOIS data in its own database;

    (3)    Publishing information that has been withheld pursuant to the IRPO;

    (4)    Publishing historical versions of .nz WHOIS data through its various services; and

    (5)    Publishing .nz WHOIS data in bulk through its various services.

C.    An order requiring DomainTools to delete all historical .nz WHOIS records obtained and stored by DomainTools in violation of the .nz WHOIS Terms of Use;

D.    For judgment in favor of plaintiff, and against defendant, for damages in such amounts as may be proven at trial, including treble damages under the Washington Consumer Protection Act;

E.    For judgment against defendant for plaintiff's costs of suit, including plaintiff's reasonable attorney's fees; and

F.    For such other relief as the Court may deem just and proper.

COMPLAINT (NO. _____) – 27

1
2   DATED this 15th day of June, 2018.         s/ Todd M. Hinnen
3                                              s/ Erin K. Earl
4                                              Todd M. Hinnen, WSBA No. 27176
5                                              Erin K. Earl, WSBA No. 49341
6                                              **Perkins Coie LLP**
7                                              1201 Third Avenue, Suite 4900
8                                              Seattle, WA  98101-3099
9                                              Telephone:  206.359.8000
10                                             Facsimile:  206.359.9000
11                                             Email:    THinnen@perkinscoie.com
12                                                       EEarl@perkinscoie.com
13                                                       Attorneys for Plaintiff
14                                             Domain Name Commission Limited
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

COMPLAINT (NO. _____) – 28

Exhibit 1

**DOMAIN NAME COMMISSION**

🔍 Search Domains...                    Domain Search

The Commission | Dispute Resolution | Registrars | Individual Registrant Privacy | Resources

Resource Library

Statistics

Reports

Brochures & Articles

Forms

Newsletters

FAQ/Help

Conflicted Name Process Guides

| Ref: | OP |
|---|---|
| Title: | Operations and Procedures |
| Date Issued: | 23 February 2018 |
| Status: | CURRENT INTERIM |
| Version: | 2.2 |

This policy is issued by Domain Name Commission Limited (DNC or Domain Name Commission) on behalf of InternetNZ, Internet New Zealand Incorporated.

**Consultations**

There are no open consultations.

**News**

DNC Newsletter May 2018
06 June 2018

Domain Name Commission
Limited Board Meeting – 26
April 2018
24 May 2018

### .nz Operations and Procedures
### Version 2.2

Index

About this policy
Background
Authorisation of Registrars
De-authorisation of Registrars
Structure of a .nz Domain Name
Second Level Domain Names
Process for the Registration of Domain Names
Privacy Option
Registration of Domain Names at the Second Level
Conflicted Name Process
Process for the Management of Domain Names
DNSSEC
The Billing Process
Unique Domain Authentication ID (UDAI)
Transfer of Registrar
Change of Registrant
Cancelling and Re-instating Domain Names
Managing Cancelled Domain Names
Disputes and Complaints
Registrars and Resellers
Domain Registration Data Query
Procedure for Disclosure of Withheld Data
Process for Registrant Info Service search
Zone Data
AOR1 - Application for Authorisation as a Registrar
DCP1 - Complaints Form
WHO1 - Application for Registrant Info Services Search – own .nz names
WHO2 - Application for Registrant Info Services Search -for DRS Complaint
WHO3 - Application for Registrant Info Services Search- for DRS Complaint Assistance
ZTP1 - Application for Release of Zone File

**1. About this policy**

1.1 This policy sets out the operations and procedures that apply to the running of the .nz domain name space and which must be followed by all participants in the .nz domain name space.

**2. Background**

2.1 InternetNZ has the ultimate responsibility as designated manager within New Zealand for the .nz domain name space, and maintains a shared registry system for the management of .nz domain name registrations. Through an Operating Agreement, InternetNZ has appointed DNCL to manage and administer the .nz domain name space on behalf of InternetNZ.

2.2 The shared registry system is a single register ("Register") for registered domain names and associated data. InternetNZ operates the Register.

2.3 Registration and management of .nz domain names, as well as management of information provided to the Registry ("Registry"), is effected by Registrars ("Registrars"). Registrars access and manage domain names on behalf of Registrants ("Registrants") and it is the Registrants to whom individual domain names are licensed.

2.4 The .nz domain name space is governed by .nz policies, which are available on the DNCL website. All participants in the .nz domain name space (including Registrants and Registrars) are bound by the .nz policies, of which this is one.

2.5 Key principles and responsibilities in the .nz domain name space are set out in the .nz Principles and Responsibilities policy.

**3. Authorisation of Registrars**

3.1 Potential Registrars can make an application to become an authorised Registrar by:

    3.1.1 Completing the Application for Authorisation as a Registrar("Form AOR1") and all its requirements.
    3.1.2 Paying a non-refundable application fee of NZD$3,000.00 (plus GST if applicable) to DNCL.

3.2 DNCL will endeavour to acknowledge applications by email within two working days of receipt. Applications will be processed in the order in which they were received. DNCL will endeavour to process applications within a month of receipt.

3.3 If an application is accepted, DNCL and the potential Registrar may execute the .nz Registrar Authorisation Agreement. A potential Registrar is not an authorised Registrar until the .nz Registrar Authorisation Agreement is executed by both parties.

[https://www.dnc.org.nz/resource-library/policies/1479 6/12/2018 2:54:48 PM]

to make a new application in the future if relevant circumstances change.

3.5 A newly authorised Registrar has six months from the date of authorisation to connect to the Registry. If the Registrar has not connected to the Registry within this time, its Authorisation Agreement may, at the Domain Name Commissioner's sole discretion, be terminated in which case it will no longer be an authorised Registrar.

**4. De-authorisation of Registrars**

4.1 A Registrar may cancel its authorisation status on two months notice to DNCL.

4.2 The Domain Name Commissioner may cancel a Registrar's authorisation status where:

4.2.1 the Registrar has transferred its authorisation status to another party;

4.2.2 the Registrar Connection Agreement with the Registry is cancelled by either party; or

4.2.3 the Registrar is in breach of their .nz Registrar Authorisation Agreement or a .nz policy.

4.3 The cancellation of a Registrar's authorisation does not affect any of its rights and responsibilities which are intended to continue or come into force after de-authorisation.

4.4 Irrespective of who cancels the Registrar's authorisation, the Registrar will:

4.4.1 continue to take all actions necessary to safeguard the rights of their Registrants;

4.4.2 immediately discontinue acting as a Registrar;

4.4.3 cease to hold themselves out as an authorised Registrar; and

4.4.4 work co-operatively with all persons to effect transfers of registered domain names to other Registrars.

4.5 Where a Registrar cancels its authorisation the Registrar must transfer the domain names under its management to another .nz Registrar in accordance with clause 14.

4.6 Where DNCL cancels a Registrar's authorisation, and the Registrar has not made alternative arrangements for the transfer of domain names under its management:

4.6.1 DNCL will contact all Registrants of those domain names and:

(a) instruct them to transfer their domains to a Registrar of their choice;

(b) provide a list of authorised Registrars, together with contact information;

(c) inform the Registrant of its domain name(s) and the UDAI for those domain name(s); and

(d) inform them of a deadline, that DNCL will set, for completion of the transfer process.

4.6.2 Those domains that are due to be renewed between the date the Registrant is contacted by DNCL and the deadline set by DNCL will be automatically renewed for one month to enable them to be transferred. DNCL will meet the Registry's renewal fees resulting from this automatic renewal.

4.7 DNCL may, at its sole discretion, extend the deadline for transfer of domain names affected by the cancellation of a Registrar's authorisation. In such cases it may engage further with the affected Registrant to assist it in transferring to a new Registrar.

4.8 After the deadline has passed DNCL will direct the Registry to cancel those domain names that have not been transferred when their current billing term expires.

4.9 Where a Registrar whose authorisation has been cancelled has been hosting a domain name, and the hosting services have also ceased, DNCL will attempt to contact affected Registrants. Other Registrars must not approach the affected Registrants to offer hosting services as a way of securing transfers of domains to them.

4.10 DNCL may, at its sole discretion, attempt to fill any hosting gaps by making temporary arrangements with other organisations. In those circumstances, DNCL will direct the Registry to update the name server information to reflect the new hosting arrangements.

**5. Structure of a .nz Domain Name**

5.1 Domain names in the .nz domain name space can be registered at either the second or the third level.

5.2 Each complete name must be unique and comprise at least two levels, with each level separated by a period (.). The following are examples of compliant .nz domain names:

5.2.1 'anyname.org.nz' where:

'.nz' is the top level, country code fixed for all domains delegated to, and managed by, DNCL.

'.org' is the listed second level domain chosen by the Registrant.

'anyname' is the name at the third level the Registrant has chosen to register.

5.2.2 'anyname.nz' where:

'.nz' is the top level country code.

'anyname' is the name the Registrant has chosen to register at the second level.

5.3 "Second level domain name" is different from "domain name registered at the second level".

5.3.1 A second level domain name is one of a limited number of listed names that a Registrant can use when registering a domain name at the third level. The '.org' example in clause 5.2.1 is an example of a second level domain name. Second level

5.3.2 A domain name registered at the second level is a name selected by a Registrant. Instead of registering it at the third level (preceding a second level domain name) it is listed at the second level (preceding the .nz top level country code).

5.4 Sub-domains can be added by the Registrant to any domain name registered at the second or third level. For example, the domain name could be 'shop.nz' and the sub-domain could be 'book', being in full, 'book.shop.nz'.

5.5 Except where a complaint is made pursuant to clause 4 of the Dispute Resolution Service Policy, sub-domains are outside the scope of .nz policy and are the responsibility of the Registrant. They must comply with RFC1591 and meet the standards defined in clause 5.6.

5.6 Any new name must conform to the relevant Internet Standards (such as RFCs 1034, 2181, 5890 and 5891) as well as specific .nz policy requirements as follows:

5.6.1 A domain name can consist of only lower case letters (a-z), digits (0-9) and the '-' hyphen;

5.6.2 Internationalised Domain Names (IDNs) are allowed (as specified in RFCs 5890 and 5891), where the characters represented by the IDN are restricted to macronised vowels (ā, ē, ī, ō, ū) in addition to the characters specified in clause 5.6.1 (an IDN must include at least one macronised vowel).

5.6.3 Domain names must not commence or end with a hyphen. Hyphens cannot be the third and fourth characters unless used in a valid IDN (when the domain name must commence 'xn--').

5.6.4 The maximum length of each name element is 63 characters.

5.6.5 The maximum length of a domain name (including separators) is 253 characters.

5.7 Name server data is not required for a domain name to be registered. If valid name server data is provided it will be published in the DNS when delegation is requested.

5.8 Name server data will be validated when provided to ensure that it meets minimum technical and operational criteria to ensure the security, stability and resilience of the DNS.

5.9 Name server data may be revalidated at any time and may be removed from the DNS should the technical and operational criteria not be met.

**6. Second Level Domain Names**

6.1 The current second level domain names are: .ac.nz, .co.nz, .cri.nz, .geek.nz, .gen.nz, .govt.nz, .health.nz, .iwi.nz, .kiwi.nz, .maori.nz, .mil.nz, .net.nz, .org.nz, .parliament.nz and .school.nz. A list of all current second level domains is maintained on the DNCL website.

6.2 The list of second level domains is closed and no further second level domains are to be created.

6.3 For further explanation of second level domains, the Second Level Domains Policy, which is no longer in force, is available in the policy archives on the DNCL website.

**7. Process for the Registration of Domain Names**

7.1 Registrars register domain names on behalf of Registrants.

7.2 Registrants must be identifiable individuals over 18 years of age or properly constituted organisations.

7.3 Any eligible Registrant may register an available domain name at the second or third level on a first come, first served basis.

7.4 The person named on the Register is the legal Registrant and therefore holds the licence to use that domain name.

7.5 The applicant, in lodging the request for the domain name, warrants that it is entitled to register the domain name as requested. For example, the applicant warrants that the proposed domain name does not infringe any other parties' rights.

7.6 Disputes regarding whether an applicant has a legitimate right to a name can be dealt with pursuant to the Dispute Resolution Service policy. DNCL has no role in deciding who has rights in such disputes.

7.7 A registration may be cancelled at any stage where the Registrant does not comply with these requirements or fails to meet any fees or other liabilities in connection with the registration or use of the domain name.

7.8 When registering a new domain name the Registrar supplies the following data:

7.8.1 Domain Name

7.8.2 Registrant Name

7.8.3 Registrant Contact Details

7.8.4 Administrative Contact Details

7.8.5 Technical Contact Details

7.8.6 Billing Term;

and, if applicable:

7.8.7 Registrant Privacy Option;

7.8.8 Name Server List

7.8.9 DS Record List

7.8.10 Registrant reference.

7.9 The Registrar must ensure that the domain name is available, that mandatory fields have

[https://www.dnc.org.nz/resource-library/policies/1479 6/12/2018 2:54:48 PM]

address format).

7.10 The Registrar must pass the details of the registration on to the Registrant. The UDAI, or instructions on how to obtain a UDAI, must also be sent out to Registrants at this time. The Registrar must provide the UDAI to the Registrant on request.

7.11 There is a grace period of five days upon a domain name first being registered, during which time the Registrar may cancel the registration.

7.12 Where the domain name is cancelled during the grace period it will be removed from the Register. The registration and cancellation will still be recorded for audit purposes. The same Registrar is able to re-register the same domain name but it is not able to be cancelled for a second time within one month of the initial registration.

7.13 A Registrant will not be able to transfer the management of its domain name to another Registrar during the grace period.

7.14 Except as set out in clause 7.15, Registrars must identify the full billing term.

7.15 Registrars' terms and conditions may provide that they are entitled to register for an initial period until they have received the monies from the Registrant and then update the domain name billing term as soon as those monies are received by the Registrar.

7.16 The operating principles for moderated domains are:

> 7.16.1 Approval for registration of the moderated name can only be made by the Moderator and occurs prior to the Registrar registering the domain name in the Register.

> 7.16.2 Moderators must either establish themselves as a Registrar or set up a relationship with one or more Registrar(s) to act as their approved Registrar(s).

> 7.16.3 Moderators are responsible for notifying the DNCL and the Registry of their accredited Registrar(s).

> 7.16.4 Only an approved Registrar will be able to register domain names in that moderated domain

## 8. Privacy Option

8.1 Registrants who are individuals are able to elect a privacy option. If this option is elected, and the Registrant is eligible, the only contact information displayed in the results returned from a Query (refer Section 22) is the name, email and country. Detailed address and phone information will be withheld ("Withheld Data") and not be displayed.

8.2 Registrants are able to elect the privacy option at the time of registering the domain name or at any later time.  Registrants are able to change their selection at any time through their Registrar.

8.3 To be eligible for the privacy option, Registrants must be:

> 8.3.1 Natural persons ("individuals") ; and.

> 8.3.2 Not using the domain name to any significant extent in "Trade" as that term is defined and used in the Fair Trading Act 1986.

8.4 DNCL may remove the privacy option from a particular domain name where it determines the Registrant does not meet the criteria specified in clause 8.3.  The Registrant will be notified before this action is taken.

8.5 This privacy option is optional for Registrars to offer until 28 March 2018 at which date all Registrars must offer this option.

## 9. Registration of Domain Names at the Second Level

9.1 In order to avoid confusion the names 'gov', 'government', 'com', 'edu', and 'nic' cannot be registered at the second level.

9.2 An Equivalent Name was a name at the second level which matched the name registered at the third level (for example, anyname.nz was the Equivalent Name for anyname.co.nz); a Conflicted Name is a name which appears at the third level in more than one second level meeting the criteria in clause 9.1.

9.3 Registrants who were either a councillor of InternetNZ or a director of DNCL or a director of NZRS Limited or a staff member or contractor of any of those three entities, or were from 1 September 2011 to 30 May 2012, qualified for the Conflicted Name process only if the Registrant has a Conflicted Name as at 1 September 2011, that at 1pm 30 September 2014 was registered and whose registration has been continuous.

9.4 The reason there is a different date for eligibility for the Registrants defined in 9.3 is to ensure there is no conflict of interest. 1 September 2011 pre-dates any discussion about a possible change to the .nz registration structure.

## 10. Conflicted Name Process

10.1 Registrants holding a domain name that meets the following criteria can use the Conflicted Name process:

> 10.1.1 a name registered as at 9.00am 30 May 2012; and

> 10.1.2 that at 1pm 30 September 2014 was registered and whose registration has been continuous; and

> 10.1.3 is not subject to clause 9.3; and

> 10.1.4 the name is conflicted,

> 10.1.5 by following the process outlined in clause 10.1 to 10.9.

> 10.1.6 For example, as at the time given, 'anyname.co.nz' is not the only domain name for the term 'anyname', 'anyname.org.nz' is also registered. The names 'anyname.co.nz' and any other 'anyname' registration are conflicted, and Registrants must follow the Conflicted Name process described in clauses 10.1 to 10.9.

10.2 Where there is a Conflicted Name, each Registrant of the Conflicted Name must indicate

10.2.1 would like the opportunity to register the Equivalent Name for possible registration as a .nz domain name at the second level; or

10.2.2 do not want to register the Equivalent Name for possible registration as a .nz domain name at the second level, and do not want any other party to register the Equivalent Name as a .nz domain name at the second level; or

10.2.3 do not want to register the Equivalent Name for possible registration as a .nz domain name at the second level, and do not object to another Registrant registering the Equivalent Name as a .nz domain name at the second level.

10.3 If a Registrant of a Conflicted Name did not indicate a preference by 18 October 2017 (clause 10.2) then that Conflicted Name ceased to be a Conflicted Name and has no involvement in the Conflicted Name process.

10.4 Where all Registrants in the Conflicted Name process for the Equivalent Name have indicated the preference of 'do not want and do not object to another', as specified in clause 10.2.3, then DNCL will deem the conflict resolved and the Equivalent Name released for registration on a first come, first served basis at a time determined by DNCL.

10.5 A Registrant of a Conflicted Name may register the Equivalent Name once the conflict is resolved. DNCL will advise the Registrant of the opportunity to register the Equivalent Name. The Registrant will have 2 months from the date of advice to register the Equivalent Name at the second level.

10.6 Where the Registrants of a Conflicted Name have come to an agreement, the Registrants will advise DNCL of the agreement via a nominated DNCL website. DNCL will advise the agreed Registrant of the opportunity to register the Equivalent Name.

10.7 Proof of the consent of the other Registrants may be required as part of the application for registration. Consent will be recorded through a nominated DNCL website. DNCL may make such inquiry as it thinks necessary to verify that consent has been given to the Registrant by the other Registrants of the Conflicted Name.

10.8 DNCL may decline the Equivalent Name at the second level if the DNCL is satisfied that the consent of any of the Registrants with the Conflicted Name:

10.8.1 has been obtained through a breach of any law; or

10.8.2 is inconsistent with any DNCL policy.

10.9 It is the responsibility of the Registrant with a Conflicted Name seeking registration at the second level to obtain the consent of the other Registrants with the Conflicted Name. DNCL will offer advice and information to the Registrant if required and may also offer the use of a facilitator to assist in the process.

10.10 The Conflicted Names Process is intended for conflicted parties. Where DNCL can demonstrate that the same entity is the Registrant of each of the domain names in the Conflicted Names process DNCL will contact the Registrant to direct them to resolve the conflict within a time specified by DNCL. Failure to resolve the conflict once notified by DNCL may result in DNCL deeming the conflict resolved and the Equivalent Name released for registration on a first come, first served basis.

10.11 For clarification purposes, if a name has been identified as a Conflicted Name and more than one Registrant of the Conflicted Name has expressed an interest in registering the Equivalent Name, then the Registrants of the Conflicted Name are not required to resolve the conflict. The Conflicted Name may remain unavailable for general registration indefinitely unless clause 10.10 applies.

10.12 The Conflicted Names process will be regularly reviewed in line with normal .nz policy development and review processes.

**11. *Process for the Management of Domain Names***

11.1 Registrars are required to maintain the details of the domain names for which they act as Registrar of record. They are able to amend/update the following fields:

11.1.1 Name Server List;

11.1.2 Registrant Name;

11.1.3 Registrant Contact Details;

11.1.4 Registrant Reference;

11.1.5 Administrative Contact Details;

11.1.6 Technical Contact Details;

11.1.7 Billing Term;

11.1.8 DS Record List.

11.2 The Registrar cannot amend the domain name itself. If there is an error in the spelling of a domain name, it must be cancelled and a new registration created.

11.3 Transactions able to be undertaken on the Register by Registrars will be those specified by the Registry.

11.4 Moderators of second level domain names must designate the Registrars that are permitted to register their second level domains. No other Registrars will be permitted to register these second level domains.

11.5 Only the Registrar-of-record for a domain name may send a renewal notice to a Registrant. A Registrar who is not the Registrar-of-record may not send any notice that is, or may reasonably be considered to be, a renewal notice to any Registrant.

11.6 Subject to clause 11.7, DNCL does not have jurisdiction to consider complaints relating to the following:

11.6.1 illegal or malicious use of a domain name, for example spam or phishing;

11.6.2 objectionable or offensive website content; or

11.6.3 possible breaches of legislation.

More information on these issues is contained in the FAQ section of DNCL's website

11.7 DNCL may cancel, transfer or suspend a domain name registration where maintaining the registration would put DNCL in conflict with any law, including the terms of an Order of a Court or Tribunal of competent jurisdiction.

## 12. *DNSSEC*

12.1 In relation to managing DNSSEC (domain name system security extensions) signed domain names, Registrants (or their DNS Operator) and Registrars are responsible for:

> 12.1.1 generating and managing their keys;
>
> 12.1.2 generating the DS Record; and
>
> 12.1.3 determining how often they perform key rollovers.

12.2 When a Registrant elects to un-sign a DNSSEC signed name, the Registrar will remove the DS Records for that name as soon as practicable.

12.3 Registrants can elect to operate their own DNS or they can delegate this responsibility to a third party called a 'DNS Operator'. The DNS Operator may be the Registrar for the domain name, a Registrar who does not manage the domain, a hosting provider, an ISP, or other third party that offers DNS management services.

12.4 When a change of DNS Operator for a signed domain name is required and both the current and proposed DNS Operators are Registrars, then the cooperation and participation set out in 12.5 is required.

12.5 The following applies to domain names which are DNSSEC enabled:

> 12.5.1 Prior to a name server update, the relinquishing DNS Operator must provide the zone information for the domain name when requested to do so, and accept and add the new DNSKEY to the zone for the domain name, re-sign it and continue to serve this until they are notified the change is complete.
>
> 12.5.2 The gaining DNS Operator then provides the new DS Record to the relinquishing DNS Operator who provides it to the Registry. The name servers for the domain name can then be updated with the Registry.
>
> 12.5.3 Following the name server update, the gaining DNS Operator must delete the old DS Record and DNSKEY provided by the relinquishing DNS Operator.
>
> 12.5.4 The relinquishing DNS Operator must remove the domain name from its name servers when requested, but must not remove it before being requested to do so.
>
> 12.5.5 All of the steps referred to in this clause shall be undertaken as soon as practicable.

12.6 DNCL will establish and maintain a contact repository of .nz DNS operators who offer DNSSEC services.

## 13. *The Billing Process*

13.1 The Registry will bill for the registration and renewal of domain names on a monthly billing period.

13.2 Registrars are obliged to disclose the billing term arranged between a Registrar and a Registrant to the Registry through the registration transaction, so they are billed for the same period that they have billed their Registrants, on an individual domain name basis.

13.3 A domain name's billing period will begin at the time it is registered, or renewed and extend for the number of monthly increments indicated by the billing term. The Registrar who administered the domain name at the start of the period will be billed.

13.4 The billing extraction will not occur until after the registration or renewal grace period (five days) for each billing term.

13.5 If the domain name is cancelled during the grace periods, the registration or renewal will not be billed.

13.6 Registrars may initiate the renewal process at any time during a domain name's current term, in advance of the normal renewal date. Advance renewals must be handled in the same manner as normal renewals, although they will not be accepted if the end of the new term is more than 120 months from the current date. Registrars will be billed for advance renewals.

13.7 Immediately following the billing of a domain name for a multiple number of months, the billing term will be re-set to one month.

13.8 To continue billing the domain name for a multiple term at renewal, the Registrar must re-set the billing term again, using the standard update process. This prevents domain names which have been billed for a longer term being automatically renewed for the same term, before the Registrar has determined the terms of the renewal, or even if a renewal is required.

13.9 The billing extraction process does not generate credits. In the event that credits are required, these must be handled outside the Register, through the Registry's invoicing system.

13.10 If a cancelled domain name that is pending release becomes due for renewal, it will not be renewed (and therefore not billed).

13.11 If a cancelled domain name is re-instated during its pending release period the renewal process will be applied retrospectively, as if the name had not been cancelled, thus effectively 'catching up' with all the billing that would otherwise have occurred during the period of cancellation.

13.12 The Registrar may set the billing period to "0" where it has received a specific instruction from the Registrant not to renew the domain name registration. The Registrar may not set the billing period to "0" to circumvent the automatic renewal function of the Registry.

13.13 The billing extraction process will not occur for domain names that have been locked. Once a domain name is unlocked, billing 'catch-up' transactions will be generated in the normal manner.

14. *Unique Domain Authentication ID (UDAI)*

14.1 Registrars and the Registry may generate a new UDAI at any time.

14.2 A function will be provided for Registrars to check that a UDAI is valid.

14.3 Registrars must pass on the UDAI to Registrants whenever a new UDAI is generated. This applies from the time a Registrar first connects to the shared registry system. As stated in clause 7.10, the UDAI must also be provided to Registrants on request. If the Registrar fails to provide a UDAI to the Registrant, DNCL may do so.

14.4 For security reasons, UDAIs will expire at the end of a set period.

**15. Transfer of Registrar**

15.1 The Registrant may transfer its domain name to another Registrar at any time other than during the five day registration grace period.

15.2 The Registrant's UDAI is required to enable a transfer of a domain name from one Registrar to another.

15.3 A Registrar must not decline or delay a Registrant's request to transfer its domain name to another Registrar (by withholding the UDAI or otherwise).

15.4 Neither the releasing Registrar nor the Registry is entitled to charge any fees for the transfer of a domain name. For the avoidance of doubt, this clause does not oblige the releasing Registrar to reimburse the Registrant for the remaining term of its domain name agreement.

15.5 A domain name that is locked cannot be transferred except through a manual transaction undertaken by the Registry. An application must be made to DNCL for this to occur.

15.6 A batch transfer facility is provided for use by the Registry for situations in which, for example, a Registrar's business is sold to another authorised Registrar. The only circumstance in which DNCL will authorise the transfer is when the relinquishing Registrar demonstrates that the affected Registrants are aware of the transfer and have signed up to the gaining Registrar's agreements.

15.7 The process to transfer a domain name from one Registrar to another is as follows:

15.7.1 The Registrant asks the gaining Registrar to have its domain name(s) transferred to it.

15.7.2 If the gaining Registrar agrees to the transfer, it must disclose its terms and conditions and provide a contract.

15.7.3 If the Registrant accepts the terms and conditions of the gaining Registrar's contract, then it will supply its domain name and its UDAI to the gaining Registrar.

15.7.4 The gaining Registrar will submit a "transfer" transaction to the Registry.

15.7.5 The Register will immediately be changed.

15.7.6 The Registry will inform the releasing Registrar of the change.

15.7.7 If, as the result of the transfer, other domain name details need changing (e.g. Name Server List, Registrant Customer ID, Administrative and Technical Contact Details), the gaining Registrar will initiate an update transaction in the standard manner.

**16. Change of Registrant**

16.1 A Registrant may transfer its domain name to another Registrant.

16.2 Registrars must have a process in place to deal appropriately with the change of Registrant, which must be clearly identified to the Registrant.

16.3 Before transferring a domain name to a new Registrant, the Registrar must ensure that the transfer is properly authorised by the existing Registrant.

16.4 Registrars must ensure the prospective Registrant signs up to the Registrar's terms and conditions and agrees to be bound by the .nz policies.

16.5 Registrars must retain all documentation and correspondence relating to the transfer.

16.6 Registrars may require the current Registrant to provide a statutory declaration where they have concerns about its authority to effect the change in Registrant details.

16.7 Registrars may seek an indemnity for any costs, losses, or liabilities incurred in the reasonable performance of their duties in processing the Registrant's request, or in dealing with claims arising from the allocation or use of the domain name.

**17. Cancelling and Re-instating Domain Names**

17.1 Domain names are automatically renewed and do not lapse unless cancelled.

17.2 Domain names may be cancelled by the Registrar at the request of the Registrant, where the Registrar has given 14 days notice due to non-payment, or where the Registrant has breached its agreement with the Registrar, and the agreement specifies domain name cancellation as a sanction for the breach.

17.3 Cancelled domain names will be assigned a status of 'pending release' and will not become available for reuse for a period of 90 days. Cancelled domain names, either pending release or released, will not be included in the next zone file pushed to the DNS.

17.4 During the pending release period, the Registrar may fully re-instate the domain name for the Registrant, so that it becomes active again. The domain name may also be transferred to a new Registrar and be reinstated by that new Registrar.

17.5 The billing process is unaffected by the cancellation and any re-instatement. Although the domain name will not have been billed for the period that it was pending release, once it has been re-instated the billing process will generate 'catch-up' transactions, from the original cancellation date.

**18. Managing Cancelled Domain Names**

18.1 If the domain name has passed out of its pending release period, it will be released, thus

[https://www.dnc.org.nz/resource-library/policies/1479 6/12/2018 2:54:48 PM]

becoming available for anyone to register.

18.2 When they are released, domain names will be removed from the Register.

18.3 Registrars must release all cancelled domain names back to the Registry and are not permitted to retain domain names for on-sale to a third party.

### 19. Disputes and complaints

19.1 In the event of a dispute between a Registrant and a Registrar, the parties should attempt to resolve matters between themselves before seeking DNCL's assistance.

19.2 DNCL will generally be involved in a dispute or complaint if there is a prima facie breach of a .nz policy, or an agreement between participants.

19.3 DNCL may become involved on the receipt of a complaint, or of its own initiative.

19.4 DNCL will abide by the principles of natural justice when investigating complaints and disputes and when making determinations and imposing sanctions.

### 20. Registrars and Resellers

20.1 Registrars are responsible for all actions of any person or organisation acting as a reseller through the authorised registrar. Resellers are required to meet the same obligations and standards as registrars in their dealings with domain names and registrants. If a registrar does not offer registry services to what the DNC, in the DNC's sole discretion, may decide is the public, or any section of the public however that section is selected, then all users of the registrar's services will be resellers for the purposes of the .nz policies. For these purposes "the public" can include government departments, offices or agencies. Ensure that any organisation, whether a reseller or not, working in any way through or with the registrar's systems operates in a manner consistent with the .nz policies.

20.1.1 The registrar will raise the issue with the reseller as soon as possible after the breach is identified setting out the reasons they are in breach and what remedies are required. They should also specify the timeframe the reseller has to remedy and the consequences if the remedies are not completed within the required timeframe. The registrar is encouraged to seek the guidance of the DNC before specifying such activities.

20.1.2 The timeframe to remedy the breach or breaches must be reasonable and reflect the seriousness of the non-compliance. That is, more urgent changes will be needed if the breach actions are serious with major consequences for the registrants.

20.1.3 Where the breach has not been remedied by the deadline, the registrar will advise the DNC of the situation and apply for approval to proceed to invoke the consequences of the non-compliance. Such consequences may include transferring responsibility for managing the .nz names involved from the reseller account to the direct responsibility of the registrar.

20.1.4 Transferring responsibility of the names from the reseller to the registrar is a significant step that impacts the relationship the registrant has with their provider so will only be considered where the registrar can demonstrate to the satisfaction of the DNC that:

(a) the resellers actions are in breach of the .nz policies such that registrants are being negatively impacted; and

(b) the reseller has been advised of its breach or breaches of the .nz policies, what it needs to do to remedy the situation by a defined timeframe and what the consequences are of failing to make the remedies in the timeframe; and

(c) the timeframe given is fair and fits with the seriousness of the non-compliance; and

(d) the registrar has a contract / agreement with the reseller that sets out the possibility of the control of the names transferring to the direct control of the registrar in the case of a breach.

20.1.5 In exceptional circumstances, even if no formal agreement between the reseller and the registrar exists, the DNC may order the names transferred to the direct control of the registrar. This action will only be undertaken after the DNC has also taken steps with the reseller to assist them in becoming compliant and after following due process in any investigation that could lead to their names being transferred to the registrar.

20.1.6 For the purpose of this policy, any organisation or person working in any way through or with the registrar's systems in registering or managing .nz domain names on behalf of a third party can be considered a reseller and be required to operate in a manner consistent with the .nz policies.

### 21. Domain Name Registration Data Query

21.1 The public is entitled to access information about a .nz domain name through a domain name registration data query ("Query"). However, automated bulk access through the Query service, or misuse of the Query data (for example, to make unsolicited communications to a Registrant) is not authorised.

21.2 At all times the priority of the Registry and the DNCL under this policy will be to protect the security of the data in the Register from unauthorised or abusive use, while as much as is practicable preserving public access to the Query service.

21.3 The Registry shall ensure the integrity of the Register and take reasonable steps to prevent unauthorised automated access, including bulk harvesting through the Query service.

21.4 If unauthorised use of the Query service is detected, the Registry and/or DNCL, at their discretion, may take any of the following courses of action:

21.4.1 remove or limit any party's access to the Query service on a permanent or temporary basis;

21.4.2 suspend a Registrar's access to the shared registry system;

21.4.3 apply a sanction to a Registrar under any applicable agreements or .nz

21.4.4 in extreme circumstances, suspend the Query service.

21.5 The Query service will respond to a Query for a specified domain name. If the domain name is registered, the details as set out in clause 21.7 will be available. If the domain name is not registered, the Query service will show that it is available for registration.

21.6 A Query may not be undertaken using wild card searches.

21.7 The following details will be available in response to a Query:

- Domain Name;
- Registration status;
- Date registered;
- Date registered/billed until;
- Date last modified;
- Include in DNS;
- Registrar of Record (including contact details);
- Registrant Contact Details;
- Administrative Contact Details;
- Technical Contact Details;
- Name Servers;
- Domain Signed;

and, if applicable:

- DS Records;
- Date cancelled; and
- Date locked.

21.8 Where an individual Registrant has elected the privacy option (refer Section 8), the contact information displayed for the Registrant, Administrative and Technical Contacts will be limited to the name, email and country.  Detailed address and phone information will be withheld and not displayed.

21.9 Requests for the Withheld Data can be made.  The process for this is specified in Section 22.

**22. Procedure for Disclosure of Withheld Data**

22.1 DNCL's default position is that a Registrant's Withheld Data will not be disclosed.

*Application to request disclosure of Withheld Data*

22.2 Any person, entity or organisation ("Requestor") may make a written request ("Request"), using the PRI1 application form ("Application Form"), to DNCL for the disclosure of a Registrant's Withheld Data.

22.3 In order for DNCL to disclose Withheld Data, the Requestor must:

22.3.1 Establish that there is a legitimate need (as set out in clause 22.4 of this Policy) for the disclosure of the Withheld Data; and

22.3.2 Meet the further requirements set out in this Policy.

22.4 When determining whether a Requestor has established a legitimate need, DNCL will apply the relevant provisions of the Privacy Act 1993, including the Information Privacy Principles (and in particular Principle 11) as well as sections 21 and 22 of that Act.

22.5 Requestors must provide, in a timely manner, supporting documentation as may be required by DNCL in processing the Request. A failure to provide the requested information in a timely manner will be considered by DNCL a withdrawal of the application.

22.6 Subject to section 22.7 of this Policy, the Requestor must, in its Application Form, declare that an attempt to contact the Registrant by email was made no less than 10 working days prior to making the Request and that the Registrant has either not responded to the contact or has refused to divulge the Withheld Data.

22.7 DNCL may excuse the Requestor's compliance with clause 22.6 in circumstances where:

22.7.1 The matter is so urgent that it is not practicable or reasonable for the 10 working day time limit to apply; or

22.7.2 Attempted contact with the Registrant would likely prejudice the purpose for which the Withheld Data is sought

22.8 In the event of non-compliance with clause 22.6, the Requestor must explain, in its Application Form, to DNCL's satisfaction, how either of the exceptions in clauses 22.7.1 and 22.7.2 apply.

22.9 The Requestor must declare that any use of Withheld Data will be limited to the purposes for which it is sought and that the Withheld Data will not be used, disclosed, published or disseminated for any other purpose.

*DNCL decision making process*

22.10 DNCL will acknowledge Requests by email and will endeavour to process Requests as soon as is practicable.

22.11 DNCL shall consider the Request against the criteria and requirements of this Policy before making a preliminary decision as to whether to disclose the Withheld Data.

22.12 When considering its preliminary decision, DNCL may refuse a Request based on any previous misuse by the Requestor of Withheld Data or breach of .nz policies notwithstanding that the Request meets the criteria and requirements of this Policy.

22.13 Subject to section 22.18 of this Policy, where DNCL's preliminary decision is to disclose the Withheld Data, DNCL shall, before disclosing the Withheld Data, notify the Registrant of the following information:

22.13.1 That a Request for the Registrant's Withheld Data has been made;

22.13.2 The Requestor's name and email address;

22.13.3 The reason for the Request;

22.13.4 That DNCL's preliminary decision is to disclose the Withheld Data

22.14 Where the Registrant has been notified of a preliminary decision in accordance with clause 22.13 of this policy, the Registrant shall have five working days to comment on DNCL's preliminary decision.

22.15 After considering the Registrant's comments (if any), DNCL shall make a Final Decision as to the disclosure of the Withheld Data.

22.16 Where the Registrant satisfies DNCL that there are legitimate grounds for non-disclosure, DNCL may in its absolute discretion decline the Request notwithstanding that the Request meets the criteria and requirements of this Policy.

22.17 DNCL may at its discretion make a final decision that differs from the request where DNCL considers it would better protect privacy. For example, disclosure of Withheld Data to a Requestor's lawyer for service of documents on condition it isn't disclosed further.

22.18 DNCL shall communicate its Final Decision to both the Registrant and Requestor and provide reasons in writing for its decision.

22.19 DNCL shall not provide the Registrant with an opportunity to comment on its preliminary decision where DNCL reasonably considers that this would prejudice the purpose for which the Withheld Data is being requested. Where the Registrant is not given an opportunity for comment, the DNCL's preliminary decision shall constitute the Final Decision.

22.20 Where section 22.19 of this Policy applies, DNCL shall only provide reasons for its Final Decision to the Requestor.

22.21 Where a Registrant is not given an opportunity for comment before the disclosure of the Withheld Data, DNCL shall notify the Registrant of the disclosure, and reasons for it, as soon as practicable. Not all of the Withheld Data may be provided at the discretion of DNCL.

*Misuse of Withheld Data*

22.22 DNCL may refuse to accept further requests from Requestors who misuse Withheld Data and/or breach .nz policies. Misuse may also lead to formal complaints laid with any other appropriate agencies such as the Privacy Commissioner.

*Disclosure where court order or requirement of law*

22.23 DNCL shall disclose Withheld Data where the disclosure is ordered by a court of competent jurisdiction or is required by any other order with the force of law.

22.24 Where section 22.23 of this Policy applies, the Registrant shall not be consulted before the Withheld Data is disclosed but the Registrant shall be notified as soon as practicable after the disclosure, unless such notification would prejudice the purpose for which the Withheld Data is sought.

*DNCL to enter into MOUs*

22.25 DNCL may enter into Memorandums of Understanding ("MOU") with entities which DNCL considers have a legitimate need for access to Withheld Data. Such MOUs shall provide either automatic access to Registrants' Withheld Data or streamlined access to Registrants' Withheld Data.

22.26 All executed MOUs will be published on DNCL's website and will be regularly reviewed by DNCL.

*Entities with automatic access*

22.27 DNCL may enter into MOUs granting automatic access to Withheld Data to approved entities tasked with maintaining the integrity of the Internet. DNCL will ensure these entities have procedures in place to protect the Withheld Data.

22.28 Where an entity has automatic access, the Registrant will not be consulted before the entity accesses the Withheld Data.

22.29 Subject to section 22.28 of this Policy, the Registrant will be notified of the disclosure of the Withheld Data as soon as practicable after its release.

22.30 The Registrant will not be notified of the disclosure where DNCL reasonably considers that disclosure would prejudice the purpose for which the Withheld Data was accessed.

22.31 DNCL will be notified on each occasion an entity accesses a Registrant's Withheld Data.

22.32 At its discretion, DNCL shall monitor the entity's use of Withheld Data to ensure that the MOU is being complied with.

22.33 It will be in DNCL's sole discretion to terminate an MOU where an entity is non-compliant with the terms of the MOU.

*Entities with streamlined access*

22.34 DNCL may enter into MOUs with certain entities granting streamlined access to Registrants' Withheld Data.

22.35 Under those MOUs, entities shall be required to make written requests to DNCL for Withheld Data. There will be a presumption of disclosure of the Withheld Data where requests satisfy the criteria for disclosure as set out in the MOU.

22.36 Where an entity has streamlined access, the Registrant will not be consulted before the Withheld Data is disclosed.

22.37 Subject to section 22.36 of this Policy, the Registrant will be notified of the disclosure of the Withheld Data as soon as practicable after its disclosure.

22.38 The Registrant will not be notified of the disclosure where DNCL reasonably considers that disclosure would prejudice the purpose for which the Withheld Data was requested.

22.39 At its discretion, DNCL shall monitor the entity's use of Withheld Data to ensure that the MOU is being complied with.

22.40 It will be in DNCL's sole discretion to terminate an MOU where an entity is non-compliant with the terms of the MOU.

*Reporting*

Withheld Data and those approved/declined.

### 23. Process for Registrant Info Service search

23.1 DNCL shall offer a Registrant Info Service providing a list of domain names matching the Registrant's search criteria.

23.2 The application for a Registrant Info Service search is made to DNCL using the following form:

   23.2.1 Form WHO1 for a search for the applicant's own domain names.

   23.2.2 Form WHO2 for a search to support a complaint pursuant to the .nz Dispute Resolution Service policy.

   23.2.3 Form WHO3 for pre-registration for registrant info service searches to support a complaint pursuant to the .nz Dispute Resolution Service policy.

23.3 Information required in an application to search for a Registrant's own domain name includes, but is not limited to, the following:

   23.3.1 Name and contact details of applicant.

   23.3.2 Details of the search parameters sought.

   23.3.3 Evidence as to the applicant's identity (for example, a photocopy of a driver's licence) and, where appropriate, evidence as to the applicant's authority to apply for a search on behalf of a company (for example, written authorisation signed by a director of the applicant company).

   23.3.4 An undertaking that any information provided as a result of a Registrant Info Service search is for the applicant's own use and will not be inappropriately disseminated.

23.4 Information required in an application for a Registrant Info Service search to support a complaint pursuant to the Dispute Resolution Service policy includes, but is not limited to, the following:

   23.4.1 Name and contact details of applicant.

   23.4.2 The domain name(s) that are the subject of the proposed complaint (limited to maximum of five).

   23.4.3 The Registrant name(s) on the Register for the domain names(s) specified in clause 23.4.2 above will be used as the search parameter.

   23.4.4 An undertaking that any information provided as a result of a Registrant Info Service search is for the exclusive purpose of supporting a complaint pursuant to the Dispute Resolution Service policy and will not be used for any other purpose.

23.5 DNCL, at its sole discretion, may either approve or decline the Registrant Info Service application, or seek further information from the applicant.

23.6 All search applications will be recorded by DNCL and any previous searches will be taken into account when deciding whether to approve the search application.

23.7 If DNCL considers, on reasonable grounds, that a Registrant has misused the information arising from a Registrant Info Service search, it may ban the Registrant from using the Registrant Info Service search for such period as DNCL deems appropriate.

### 24. Zone Data

24.1 In certain circumstances, .nz zone data may be released to third parties not directly involved in the management of the Registry and/or the .nz domain name space.

24.2 The zone data may not be released to third parties unless there is sufficient reason to justify such release. DNCL will retain sole discretion regarding whether or not to release zone data.

24.3 Zone data may be released where it can be demonstrated that there is a "public good" aspect to the release of the information that outweighs any adverse effect on Registrant's privacy.

24.4 DNCL may grant an application on such conditions it thinks fit, including (but not limited to) requiring the applicant to enter into an agreement with DNCL as to the terms of release. The agreement may:

   24.4.1 reflect the information provided in the application;

   24.4.2 confirm that the applicant agrees to be bound by the .nz policies;

   24.4.3 require deletion of the zone data after use or after a prescribed time;

   24.4.4 include sanctions in the event of a breach of the agreement; and

   24.4.5 include any other conditions that DNCL, in its sole discretion, consider appropriate.

24.5 DNCL and the Registry may use the zone data to ensure the efficient management and operation of the .nz zone and .nz domain name space, for reasons of "public good", and for developing new services.

24.6 An application to request .nz zone data may be made to DNCL on form ZTP1.

24.7 Information required in support of the application includes, but may not be limited to, the following:

   24.7.1 The purpose the applicant will be using the information for.

   24.7.2 The reason the applicant needs to obtain the information from the zone data.

   24.7.3 How often the applicant wishes to receive the zone data and the period of time the zone data will be required, i.e. a single file, up to a specified date or indefinitely.



24.7.5 How long after receipt of the zone data the information from it will be publicly released.

24.7.6 The "public good" purpose the information will be put to.

24.7.7 Whether the applicant intends to retain the information and, if so, why.

24.7.8 The measures that are in place to protect Registrants' privacy.

24.7.9 Any confidentiality agreements in place with its staff or contractors.

24.8 DNCL, at its sole discretion, may either approve or decline the .nz zone data application, or seek further information from the applicant. In making its decision DNCL may consult with the Registry.

---

### Contact Us

info@dnc.org.nz
PO Box 11 881
Wellington 6142 NZ
0800 101 151

### Resources

Site Search
Site Map
Privacy Statement

### Newsletter

Subscribe

Unless otherwise stated, this work by Domain Name Commission is licensed under a Creative Commons Attribution 4.0 International License.

Exhibit 2

**DOMAIN NAME COMMISSION**

Search Domains...    Domain Search

The Commission   Dispute Resolution   Registrars   Individual Registrant Privacy   Resources

.nz Query

Whitelisting

Recent Changes

## "dnc.org.nz" (Active)

| | |
|---|---|
| Query Date Time | 18 June 2018 9:56 am |
| Domain Name | dnc.org.nz |
| Query Status | Active |
| Domain Date Registered | 23 April 2002 12:00 am |
| Domain Date Billed Until | 23 June 2018 12:00 am |
| Domain Date Last Modified | 23 May 2018 11:32 am |
| Domain Delegate Requested | yes |
| Domain Signed | no |
| | |
| Registrar Name | Domain Name Commissioner |
| Registrar Address | PO Box 11881 |
| Registrar City | Wellington |
| Registrar Country | NZ (NEW ZEALAND) |
| Registrar Phone | +64 4 472 1600 |
| Registrar Fax | +64 4 495 2115 |
| Registrar Email | info@dnc.org.nz |
| | |
| Registrant Name | Domain Name Commission Ltd |
| Registrant Contact Address | PO Box 11881 |
| Registrant Contact City | Wellington |
| Registrant Contact Postal Code | 6142 |
| Registrant Contact Country | NZ (NEW ZEALAND) |
| Registrant Contact Phone | +64 4 472 1600 |
| Registrant Contact Email | info@dnc.org.nz |
| | |
| Admin Contact Name | Domain Name Commission Ltd |
| Admin Contact Address | PO Box 11881 |
| Admin Contact City | Wellington |
| Admin Contact Postal Code | 6142 |
| Admin Contact Country | NZ (NEW ZEALAND) |
| Admin Contact Phone | +64 4 472 1600 |
| Admin Contact Email | info@dnc.org.nz |
| | |
| Technical Contact Name | Domain Name Commission Ltd |
| Technical Contact Address | PO Box 11881 |
| Technical Contact City | Wellington |
| Technical Contact Postal Code | 6142 |
| Technical Contact Country | NZ (NEW ZEALAND) |
| Technical Contact Phone | +64 4 472 1600 |
| Technical Contact Email | info@dnc.org.nz |
| | |
| NS Name | a.ns.internetnz.net.nz |
| NS Name | b.ns.internetnz.net.nz |
| NS Name | c.ns.internetnz.net.nz |

### Status Types

▼ Active

Means the domain name has already been registered.

▶ Pending Release

▶ Available

▶ Prohibited

▶ Conflicted

▶ Resolved

### Consultations

There are no open consultations.

### News

DNC Newsletter May 2018
04 June 2018

Domain Name Commission Limited Board Meeting – 26 April 2018
24 May 2018

**Terms of Use:** By submitting a WHOIS query you are entering into an agreement with Domain Name Commission Ltd on the following terms and conditions, and subject to all relevant .nz Policies and procedures as found at https://dnc.org.nz/. It is prohibited to:
- Send high volume WHOIS queries with the effect of downloading part of or all of the .nz Register or collecting register data or records;
- Access the .nz Register in bulk through the WHOIS service (ie. where a user is able to access WHOIS data other than by sending individual queries to the database);
- Use WHOIS data to allow, enable, or otherwise support unsolicited commercial advertising, or mass solicitations to registrants or to undertake market research via direct mail, electronic mail, SMS, telephone or any other medium;
- Use WHOIS data in contravention of any applicable data and privacy laws, including the Unsolicited Electronic Messages Act 2007;
- Store or compile WHOIS data to build up a secondary register of information;
- Publish historical or non-current versions of WHOIS data; and
- Publish any WHOIS data in bulk.

Copyright Domain Name Commission Limited (a company wholly-owned by Internet New Zealand Incorporated) which may enforce its rights against any person or entity that undertakes any prohibited activity without its written permission. The WHOIS service is provided by NZRS Limited.

---

### Contact Us
info@dnc.org.nz
PO Box 11 881
Wellington 6142 NZ
0800 101 151

### Resources
Site Search
Site Map
Privacy Statement

### Newsletter
Subscribe

Unless otherwise stated, this work by Domain Name Commission is licensed under a Creative Commons Attribution 4.0 International License.

# Exhibit 3



# Exhibit 4



# Domain Name Registration Data Query

.nz domain name registration information is able to be searched by domain name; this is in line with the InternetNZ TLD principles and .nz domain name policy.

The ability to search for this information is referred to as a domain name registration data query ("Query"), or a domain name search.

A number of protections will be in place to protect .nz registrant information from being harvested including a CAPTCHA and service rate-limiting. By performing a 'Query', you are also agreeing to be bound by the Terms of Use of the service.

You can perform a 'Query' by using the search domains box above. Additionally, instructions on how to perform a 'Query', will be made available shortly.

The Domain Name Commission has also introduced an Individual Registrant Privacy Option (IRPO) which allows registrants that are not using their domain name to any significant extent in 'Trade' to apply. This withholds some details from display if a 'Query' is performed on that domain name. If you want to know more about IRPO, check out the additional information we have on our website.

## Status Types

▶ Registered
▶ Pending Release
▶ Available
▶ Prohibited
▶ Conflicted
▶ Resolved

## Consultations

There are no open consultations.

## News

DNC Newsletter May 2018
04 June 2018

Domain Name Commission Limited Board Meeting – 26 April 2018
24 May 2018

## Contact Us

info@dnc.org.nz
PO Box 11 881
Wellington 6142 NZ
0800 101 151

## Resources

Site Search
Site Map
Privacy Statement

## Newsletter

Subscribe

Unless otherwise stated, this work by Domain Name Commission is licensed under a Creative Commons Attribution 4.0 International License.

# Exhibit 5



Exhibit 6



1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099

☎ +1.206.359.8000
🖷 +1.206.359.9000
PerkinsCoie.com

November 2, 2017

Todd M. Hinnen
THinnen@perkinscoie.com
D. +1.206.359.3384
F. +1.206.359.4384

**VIA EMAIL**
**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

DomainTools, LLC
2101 4th Ave, Suite 1150
Seattle, Washington 98121
memberservices@domaintools.com

**Re:    Cease and Desist Abuse of .nz WHOIS Data**

Dear Sir or Madam:

It has come to the attention of our client, Domain Name Commission Limited ("DNCL"),[1] that
DomainTools accesses and queries .nz WHOIS servers, downloads .nz WHOIS data, and re-
publishes that data through its "Whois History" and "Reverse Whois" products.  Such access and
use of .nz WHOIS data violates the .nz WHOIS Terms of Use ("TOU").

The TOU prohibit sending high volume WHOIS queries, using the WHOIS service to access the
.nz Register in bulk, storing and compiling WHOIS data to create a secondary register of
information, publishing a historical or non-current version of WHOIS data, and publishing any
WHOIS data in bulk.  DomainTools' conduct also infringes registrants' privacy by publishing
their contact addresses and telephone numbers.

In addition to violating the TOU, DomainTools's conduct may violate the federal Computer
Fraud and Abuse Act, the Washington Consumer Protection Act, and state laws prohibiting
trespass to chattels and conversion.

DNCL accordingly demands that DomainTools immediately cease and desist accessing .nz
WHOIS servers or using and publishing .nz WHOIS data except as permitted by the TOU.
DNCL also demands that DomainTools cease and desist offering services based on .nz WHOIS
data. **Please respond in writing no later than Wednesday, November 15, confirming that
you have ceased this behavior.**

This letter is not intended by our client, and should not be construed by you, as a waiver or
relinquishment of any claim, right or remedy relating to this matter.  Our client specifically

---

[1] DNCL is a subsidiary of InternetNZ, a non-profit entity recognized by the Internet Corporation for Assigned
Names and Numbers (ICANN) as the sole authority for administration and management of .nz domain names.

137407735.1
Perkins Coie LLP

DomainTools
November 2, 2017
Page 2

reserves all such claims, rights and remedies whether at law or inequity.  Please do not hesitate to contact us if you have questions regarding these demands or would like to discuss this matter.

Sincerely,

Todd M. Hinnen

Exhibit 7



**Orrick, Herrington & Sutcliffe LLP**

701 Fifth Avenue
Suite 5600
Seattle, WA 98104-7097

+1 206 839 4300
**orrick.com**

February 7, 2018

*Via E-Mail*

Todd M. Hinnen
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099

**Aravind Swaminathan**

**E** aswaminathan@orrick.com
**D** +1 206 839 4340
**F** +1 206 839 4301

Re:     **Cease and Desist Abuse of .nz WHOIS Data**

Dear Todd:

    As you know, we represent DomainTools, LLC ("DomainTools"), and are writing to follow up on Domain Name Commission Limited's ("DNCL") November 2, 2017 letter and DomainTools' December 1, 2017 letter regarding the .nz domains.  First, thank you again for your patience in awaiting our response.

    As we discussed, we want to emphasize that for more than 20 years, DomainTools has been an important partner to many organizations that are focused on making the internet safer.  As you know, DomainTools provides network and cyber security solutions to a broad array of international law enforcement agencies and more than 500 Enterprise customers, including customers in New Zealand.  DomainTools services are based, in part, on domain name ownership data.  That ownership data is critical in cyberattack attribution and attacker infrastructure mapping.  It also plays an important role for security analysts and in the development of threat intelligence.

    DomainTools does not believe that it has violated any laws, as described in your November 2, 2017 letter—including, the Computer Fraud and Abuse Act, the Washington Consumer Privacy Act, or any other state laws prohibiting trespass to chattels and conversion.

    Furthermore, DomainTools does not believe that it violates DNCL's Terms of Use.  Notwithstanding, in the interest of reviewing its practices and considering DNCL's expectations on what is required for compliance with DNCL's Terms of Use, it would be helpful to have a better understanding of how DNCL interprets (1) "high volume" WHOIS queries and (2) "bulk" access of the .nz Register.  In particular, it would be useful to understand how DNCL defines these terms, especially in the context of how other public entities access the same services and data that DNCL makes available, in part because we understand that DNCL currently is reassessing how to reduce the available data obtained about .nz domains through Port 43 WHOIS.  *See* https://dnc.org.nz/port-43.  To be clear, it is not DomainTools' intention to create a secondary register of .nz domains or to publish the data to the public in bulk.



Todd M. Hinnen
February 7, 2018
Page 2


As we have offered in the past, DomainTools would prefer to have constructive relationships with ccTLD registries, including DNCL.  We look forward to hearing from you further as outlined above.  Please feel free to contact me if you have any questions regarding the foregoing.

Sincerely,

Aravind Swaminathan

Exhibit 8



June 6, 2018

Todd M. Hinnen
THinnen@perkinscoie.com
D.  +1.206.359.3384
F.   +1.206.359.4384

**VIA EMAIL**

Jacob M. Heath
Aravind Swaminathan
Orrick, Herrington & Sutcliffe LLP
701 Fifth Avenue, Suite 5600
Seattle, WA  98104-7097

**Re:     Cease and Desist Abuse of .nz WHOIS Data**

Dear Jake and Aravind:

This letter renews the demand made by our client, Domain Name Commission Limited
("DNCL"), in our letter of November 2, 2017 (the "November 2 Letter"), that your client,
DomainTools, LLC, immediately cease and desist its activities in violation of the Terms of Use
governing the .nz WHOIS servers.

As stated in the November 2 Letter, DomainTools's previous access to the .nz WHOIS servers in
violation of the Terms of Use accompanying the limited license granted to .nz WHOIS users was
unauthorized.  In light of DomainTools's continuing unauthorized access, **DNCL hereby
notifies DomainTools that its limited license to access the .nz WHOIS servers is revoked.**
Accordingly, neither DomainTools nor its agents, employees, affiliates, or anyone acting on its
behalf may access the .nz WHOIS services for any reason whatsoever.  DNCL will implement
additional available technical measures to prevent DomainTools from further accessing the .nz
WHOIS servers.

**In addition, unless DomainTools confirms in writing by Wednesday, June 13, 2018, that it
has ceased its unlawful activities, DNCL intends to file a Complaint and seek injunctive
relief by no later than Friday, June 15, 2018.**

We once again provide below additional details concerning DomainTools' ongoing activities in
violation of the Terms of Use governing the .nz WHOIS servers.

**A.       The .nz WHOIS Service**

DNCL manages and administers the .nz domain name space and .nz Register.  Public access to
the .nz Register is provided through .nz WHOIS servers.  Users who submit queries to the .nz
WHOIS servers are bound by the .nz WHOIS Terms of Use ("TOU"), which are displayed in
response to every .nz WHOIS query.  As explained in our November 2, 2017 letter, these TOU

Aravind Swaminathan
Jacob M. Heath
June 6, 2018
Page 2

prohibit, among other things:  (1) sending high volume WHOIS queries, (2) using the WHOIS service to access the .nz Register in bulk, (3) storing and compiling WHOIS data to create a secondary register of information, (4) publishing a historical or non-current version of WHOIS data, and (5) publishing any WHOIS data in bulk.

DNCL respects individual registrants' privacy and right to protect their personal information. Accordingly, an individual registrant may elect not to have his or her telephone number and address included in the public response to a .nz WHOIS domain registrant search.  *See* Domain Name Commission, Individual Registrant Privacy Option, https://www.dnc.org.nz/IRPO.  The TOU's prohibition against publishing a historical or non-current version of WHOIS data protects this important privacy and data protection right by preventing publication of historical WHOIS records that include the telephone number and address that an individual registrant has chosen to withhold, and by prohibiting the creation of a secondary register of information that could be used to search for WHOIS records based on information that individual registrants have chosen to withhold.

**B.      Abuse of .nz WHOIS Data by DomainTools**

DomainTools presents itself as offering informational services related to online domains, including services called "Whois History," "Reverse Whois," and "Whois Lookup."  The "Whois History" tool maintains a historical record of Whois records as they appeared over time. *See* DomainTools, Whois History, https://research.domaintools.com/research/whois-history/. This information is made available to the public through a "Domain Report," which DomainTools sells in exchange for $49.  "Reverse Whois" allows the public to enter a name, email address, physical address, or telephone number of a domain registrant and obtain a list of domain names with those search terms listed in their Whois records.  *See* DomainTools, Reverse Whois, http://reversewhois.domaintools.com/.  And when a user queries a .nz domain using Whois Lookup, DomainTools provides certain information about that .nz domain, including a "Whois Record" containing exactly the results of performing a command-line "whois" query on .nz WHOIS Port 43 servers—but with the TOU removed.  *See* DomainTools, Whois Lookup, https://whois.domaintools.com.

DomainTools provides these services for .nz domains by querying the .nz WHOIS servers. Accordingly, DomainTools is subject to the .nz WHOIS TOU.  Yet these services, and potentially others offered by DomainTools, violate the .nz WHOIS TOU and infringe individual.nz registrants' privacy and data protection rights.  Indeed, based on input from the .nz online community, the contact details of registrants, administrative contacts, or technical contacts were recently removed from the information provided on the .nz WHOIS Port 43 servers specifically to prevent the type of bulk harvesting of registrant data that DomainTools has been conducting.  In particular:

Aravind Swaminathan
Jacob M. Heath
June 6, 2018
Page 3

- DomainTools stores and compiles .nz WHOIS data in its own database of domain information, associates .nz domain names with registrant information, and uses that database to provide its services.  This conduct in and of itself violates the TOU, which prohibit storing and compiling WHOIS data to create a secondary register of information.  DomainTools could only provide the Reverse Whois and Whois History services by creating and maintaining a secondary register of information.  In addition, DomainTools' process for creating this secondary register further violates the TOU because creating this database requires DomainTools to send high volume WHOIS queries and use the WHOIS service to access the .nz Register in bulk.

- The Whois History tool violates the clear terms of the TOU by publishing historical or non-current versions of WHOIS data and publishing WHOIS data in bulk.  Additionally, the Whois History tool infringes individual registrants' privacy and data protection rights by publishing personal information that those registrants have chosen to withhold using the .nz Individual Registrant Privacy Option.

- The Reverse Whois tool infringes individual registrants' privacy by allowing their personal information to be used to look up their registered domain names, even though they have chosen to withhold that personal information in response to WHOIS searches.  Additionally, the Reverse Whois tool relies on the impermissible secondary register of WHOIS information created and maintained by DomainTools.

- The Whois Lookup tool sends high volume WHOIS queries, uses the WHOIS service to access the .nz Register in bulk, stores and compiles WHOIS data to create a secondary register of information, and publishes WHOIS data in bulk.  Moreover, DomainTools uses a distributed network to submit these high-volume, bulk queries, apparently in an attempt to evade .nz WHOIS rate limiting protocols.

These, and perhaps other, DomainTools practices violate the .nz WHOIS TOU, infringe .nz registrants' privacy, and violate the federal Computer Fraud and Abuse Act (CFAA) and the Washington Consumer Protection Act.

*****

As you know, DNCL has engaged with you in good faith since its letter of November 2, 2017, yet DomainTools has declined to cease and desist its unlawful conduct.  Accordingly, DNCL by this letter revokes DomainTools' limited license to access the .nz WHOIS servers.  Unless we

Aravind Swaminathan
Jacob M. Heath
June 6, 2018
Page 4


receive notice from DomainTools by Wednesday, June 13, 2018, that it has ceased and desisted any access to the .nz WHOIS servers and services, we have been instructed by DNCL to assert their rights and claims in court.

Sincerely,

Todd M. Hinnen